Joyce Darrold LOCKE, Appellant,

v.

The ATCHISON, TOPEKA AND SANTA FE RAILWAY COMPANY, a corporation, Appellee.

No. 7030.

United States Court of Appeals Tenth Circuit.

Sept. 26, 1962.

Herbert M. Boyle, Denver, Colo. (Barry & Boyle, Denver, Colo., on brief), for appellant.

Douglas McHendrie, Denver, Colo. (Grant, Shafroth, Toll & McHendrie, Denver, Colo., on brief), for appellee.

Before PHILLIPS, PICKETT and HILL, Circuit Judges.

PHILLIPS, Circuit Judge.

Locke brought this action against the Atchison, Topeka and Santa Fe Railway Company[1] to recover damages for personal injuries under the Federal Employers' Liability Act, 45 U.S.C.A. §§ 51–60.

On April 18, 1958, Locke orally agreed with the Railway Company, acting through its claim adjuster, J. H. Wellman, to settle his claim for $5,000. Payment of that amount was made to Locke and he executed and delivered to the Railway Company a written release in full of his claim.

The Railway Company pleaded the release as a defense to the action and Locke sought to have the release set aside on the ground that it was entered into between the claim adjuster and him by reason of a mutual mistake of fact with respect to the nature and extent of his injuries. The jury found for the Railway Company on the issue of mutual mistake. The trial court denied a motion for a new trial, predicated on the asserted ground, among others, that the verdict was not supported by and was contrary to the weight of the evidence. Judgment was entered dismissing the action and Locke has appealed.

On December 17, 1957, Locke was employed by the Railway Company as a conductor, on a run between his home terminal, Clovis, New Mexico, and his away from home terminal, Vaughn, New Mexico. On such date, Locke arrived at the Railway Company's yards at Vaughn, having served as a conductor on a run from Clovis to Vaughn of a through freight train, which had originated at Chicago, Illinois, and was destined for Arizona and California points. Upon his arrival at Vaughn, Locke went to the yard office and gave the waybills on such train to the outbound conductor, registered the train in, and then signed off on the Federal Registry sheets. He then went to a caboose, which had been placed on a caboose track for the use of the train crew while at their away from home terminal at Vaughn. While Locke was asleep on a bunk in the caboose, it was struck by another caboose, resulting in injuries to his neck and back. On his return to Clovis, the afternoon of December 18, 1957, Locke consulted Dr. Moss, who was his family doctor, and also the Railway Company Hospital Association's doctor. Dr. Moss caused X-ray pictures to be taken of Locke at the Clovis Memorial Hospital and injected a pain killer to relieve Locke's pain. Locke made another round trip from Clovis to Vaughn and return to Clovis, arriving at the latter point on December 21, 1957. He again consulted Dr. Moss and was placed in the Clovis Memorial Hospital under traction. He remained under traction at the hospital until December 24, 1957, when he was permitted to return to his home, where he remained under traction until January 6, 1958.

---

1. Hereinafter called the Railway Company.

On January 6, 1958, on Dr. Moss's recommendation, Locke was moved to the Railway Company Hospital Association's hospital [2] at Albuquerque, New Mexico. Upon his admission to the Albuquerque hospital, he was examined by a neurosurgeon, Dr. Miller, who in turn placed him under the supervision of an orthopedic group of doctors, consisting of Doctors Forbis, Boyd, Jordan and Conklin. X-ray pictures were taken, traction was applied, and physical therapy administered until January 17, 1958. On that date a fasciotomy was performed on Locke by Dr. Boyd to relieve the tension from muscles and ligaments in the lower part of his cervical spine. On January 21, 1958, Locke was released from the Albuquerque hospital to return to Clovis and to continue under the care of Dr. Moss.

Locke returned to the Albuquerque hospital for a checkup on February 3, 1958, and remained there for about 10 days. During that period he was under the care of Dr. Jordan. Traction was applied and physical therapy was administered. On February 13, 1958, Dr. Jordan released him from the Albuquerque hospital.

Locke testified that on the night of February 12, 1958, Dr. Jordan told him his injuries were strained muscles and ligaments and that they would heal in a short time.

Upon his release from the Albuquerque hospital, Locke returned to Clovis, continued some physical therapy, and called Dr. Jordan on the telephone intermittently.

Locke further testified that on March 11, 1958, in a telephone conversation, Dr. Jordan advised him he was mailing a release for him to go back to work. A writing was introduced in evidence, dated March 11, 1958, which stated that Locke came under Dr. Jordan's care on February 5, 1958, and had been discharged on March 11, 1958, for regular duties. Locke returned to work on March 17, 1958, as a conductor on a local run between Clovis and Roswell, which operated three days a week.

Wellman, the claim adjuster, and Locke discussed the latter's claim against the Railway Company in March, 1958, and Wellman requested Locke to make up a statement of the basis for his claim. Locke did so, arriving at a claim of $7,906.45.

On April 18, 1958, Wellman went to Locke's home and stated that the most he was authorized to pay Locke was $5,000. Locke called Dr. Jordan on the telephone and asked him for his advice with respect to the offer. Locke testified that Dr. Jordan stated he couldn't advise him in the matter, "but it sounded like to him that it was pretty fair." Locke further testified that he then believed his injuries "were very minor and that everything was working out as it should." He further testified that Wellman showed him a report from the Santa Fe Hospital Association "showing that there was no permanent disability or damage." He further testified that Wellman believed, on the basis of the medical reports, "that there wasn't any permanent injury or damage." The settlement was then consummated and the release executed.

Locke continued working on the Clovis-Roswell run until June, 1958. He then returned to the Albuquerque hospital for a reexamination as an out patient. At that time, he consulted Dr. Forbis and stated that he had been doing all right until about two weeks previous, when he did some lifting, which started a burning pain in the area of the seventh cervical vertebra. He was admitted to such hospital on July 28, 1958, and remained for 17 days, during which time he received physical therapy and medication. On September 2, 1958, he returned to work for the Railway Company and worked as a conductor and brakeman until November, 1958, when he was again admitted to the Albuquerque hospital. In December, 1958, another fasciotomy was performed on the left side in the cervical vertebral area. He remained at the hospital about

2. Hereinafter called the Albuquerque hospital.

eight days and was then released. On release, Dr. Boyd recommended that he take an extended leave of absence. After he left the hospital, Locke applied to the Railroad Retirement Board for a disability pension and was retired, retroactive to December 2, 1958, for permanent and total disability.

Locke was again admitted to the Albuquerque hospital in May, 1959, where he remained approximately 15 days and received X-ray treatments in the area where the fasciotomy operations were performed.

Locke was examined by Dr. Ralph M. Stuck of Denver in October, 1959, and was directed to return for hospitalization and for discograms in January, 1960. He was admitted to the Presbyterian Hospital in Denver in January, 1960, where discograms were performed by Dr. Stuck. The discograms were performed at C 4-5 and C 5-6 intervertebral disc spaces. Thereafter, Dr. Stuck performed surgery on Locke, which involved the removal of the discs and further procedures to fuse the bones at such disc spaces.

Dr. Stuck was called as a witness for the plaintiff and testified that Locke consulted him on October 26, 1959, and related to him the history of his injuries and the symptoms he had suffered from such injuries; that he made a physical examination of the cervical portion of Locke's spine and arrived at the opinion that he had ruptured intervertebral discs at C 3-4, C 4-5, and C 5-6; that he directed Locke to return in January for discography to confirm the diagnosis; that he carried out the discography procedure on January 12, 1960, at C 4-5 and C5-6 and confirmed his diagnosis that Locke had ruptured discs at those spaces. He further testified that in his opinion the ruptured discs occurred as a result of the injuries that Locke received on December 17, 1957.

On cross-examination, Dr. Stuck further testified that "cervical" refers to the neck area from the base of the skull to the beginning of the neck; that when he examined Locke in October, 1959, and January, 1960, he was diagnosing Locke's

condition at those times and that he was not making any attempt to diagnose his condition as it was in February or March, 1958; that ruptured discs could have developed in Locke's cervical vertebra between February, 1958, and the time of Stuck's examinations; that degeneration of the spinal discs is rather common in middle-aged men and can result from natural causes, as well as from trauma, and that ruptured discs are a rather common condition; that once degeneration of a disc occurs a slight injury or a sudden movement or wrenching, which might seem very minor to an individual, can cause the occurrence of a ruptured disc and that a ruptured disc sometimes occurs as the result of a sneeze.

Dr. Jordan was called as a witness for Locke and testified that it was his opinion at the time Locke was released from the hospital at Albuquerque to go back to work, that while Locke was not relieved completely of his symptoms, he had improved and could return to work without danger of further harm to him; that his physical examination of Locke disclosed no neurological abnormalities and that the evidence before him at that time was inconsistent with the presence of a ruptured disc causing nerve damage. He further testified that "my subsequent experience with this situation would indicate that this patient had a ruptured disc or a damaged disc at that time."

Dr. Jordan further testified that on February 13, 1958, he explained to Locke that he had suffered a strain or sprain to the ligaments and muscles of the neck and that many times these problems were not rapid in healing, but that they would heal, and that when they healed his pain would ease off.

Dr. Jordan testified on cross-examination that after the fasciotomy was performed on Locke in January, 1958, he experienced marked relief from pain; that when a disc is damaged, including a rupture, and results in disability, the cause of disability is pain; that such pain is caused by pressure on the nerve roots, and that when such pressure occurs there are generally neurological signs or

symptoms, such as muscle weakness, loss of feeling or absence of reflexes; that such symptoms generally take place in the arm and hand where the pressure is on nerves which emanate from the neck vertebrae; that when Locke was readmitted to the hospital in February, 1958, he gave him a neurological examination and found no such neurological symptoms; that a disc may be damaged without being ruptured; that a damaged disc is more likely to rupture in the future, but that a doctor cannot forecast either whether or when, if ever, it will thereafter occur.

Doctor Conklin was called as a witness for the Railway Company and testified that he examined Locke on January 26, 1959; that such examination disclosed no neurological defects; no muscular wasting or loss of power or altered sensation in the upper extremities, or neurological symptoms indicating pressure upon the nerve roots or nerve structures; that X-rays taken of Locke's vertebrae in February, 1959, were essentially negative and showed no definite abnormalities; that he examined Locke again on May 12, 1959, and found no neurological defects; that in his opinion there was no disability or discomfort, which indicated that a discogram should be made, and that in his opinion Locke was able to perform work. On cross-examination, Dr. Conklin testified that in the course of his examination of Locke, he attempted to determine from the patient's symptoms, the result of the X-rays, Locke's response to treatment and the absence of neurological defects, whether any disc injuries had occurred, and concluded there were no disc injuries.

Dr. William R. Lipscomb, a neurosurgeon, called as a witness for the Railway Company, testified that a degeneration of the vertebral discs normally occurs after people reach maturity, influenced by the use "to which they put their spines"; that where degeneration exists the discs become more susceptible to rupture, and that where there is an appreciable degree of degeneration a ruptured disc can be caused by sneezing, coughing, or sudden twisting motions; that trauma or injury can damage a cervical disc or discs without an actual rupture, and in such a case the injured disc becomes more susceptible to subsequent rupture, but that there is no possible way of telling in advance whether such rupture will occur or when it will occur; that a ruptured disc, if great enough to press or irritate a nerve root, produces neurological symptoms, such as pain, numbness, tingling or muscle weakness in the area served by the nerve, and if a ruptured disc is sufficient to cause irritation or pressure on the nerve, such symptoms occur within a few days, and that when there is an absence of such symptoms following a particular injury, he concludes there is no nerve damage or irritation. He further testified that the discogram X-rays, in his opinion, showed that the discs were fragmented and degenerated, but did not disclose evidence of rupture; that the degeneration of the disc shown in such X-ray was not uncommon in a man of Locke's age, and that in the type of operation performed on Locke by Dr. Stuck it would be very difficult for the operating physician actually to see whether the disc is "herniated." In answer to a hypothetical question reviewing the appellant's medical record, as disclosed by the evidence, Dr. Lipscomb further stated that there was no indication that the patient had any cervical nerve root irritation due to a herniated disc in April, 1958, and that there was no such indication until Dr. Stuck's examination in October, 1959.

The evidence indicated that the letter which Locke testified the claim adjuster showed him at the time of the settlement was one dated April 4, 1958, written by Dr. Jordan, and introduced in evidence. The pertinent part of that letter read: "I feel that ultimately Mr. Locke will recover with no appreciable degree of disability. It is my feeling that it would probably be fair to estimate the disability that will be about 10%."

The release, among others, contained the following recitals:

"In making this settlement I am not relying upon any statement made by any agent or physician of said Railway Company as to what my injuries are, or how serious they are, or when or to what extent I may recover therefrom.

"It is definitely understood that in making this settlement no promise or representation is or has been made relative to future employment.

"I have read the above release and fully understand it."

On cross-examination, Locke testified that after Wellman wrote out the release he (Locke) read it in full and then in his own handwriting wrote on the bottom of the release, "I have read the above release and fully understand it" and that such statement was true.

■ In order to avoid the release, it was incumbent upon Locke to establish a mutual mistake as to a present existing fact or a past fact.[3]

Counsel for Locke requested two instructions. The first one read:

"You are instructed that if you believe from the evidence that the attending physician who was employed by the Atchison, Topeka and Santa Fe Hospital Association informed the Plaintiff after examination that he was not seriously injured and that he was released for work, and both parties mistakingly believed when the release was executed that there were no permanent injuries, the release may be set aside for mutual mistake of fact as to the nature and extent of the injuries."

The second one read:

"You are instructed that if you find from the evidence that plaintiff relying on the statements of the doctor for Atchison, Topeka and Santa Fe Hospital Association believed that he had merely suffered a sprain to the muscles of the neck and if you find that the Atchison, Topeka and Santa Fe Railroad Company also believed this to be true but where in fact discs in plaintiff's neck were ruptured, then you should set the release aside on the grounds of a mutual mistake of fact."

The court instructed the jury, in part, as follows:

" * * * the jury is instructed that the plaintiff can be relieved from the release in question if and only if he has established by a fair preponderance of the evidence first that on April 18, 1958, the date of the execution of the release in question, he was in fact suffering from ruptured intervertebral disc or discs; secondly, that on that date both the plaintiff and the defendant believed that the plaintiff's injuries were relatively minor and consisted merely of muscle and ligament strains which would not have a permanent consequence; and thirdly, the jury must be satisfied by a preponderance of the evidence that the parties acted, in executing the release and paying the consideration therefor, in the mistaken belief that the plaintiff's injuries were minor and did not consist of a ruptured disc or ruptured discs."

■ Counsel for Locke made no objection to the charge given by the court and after the court had incorporated in its charge the theory of the plaintiff's claim with respect to mutual mistake, as set forth in the second requested instruction, he did not request the court also to submit the alternative theory set forth in the first requested instruction. Accordingly, we conclude Locke wholly failed to object to the instruction given and failed to object to the refusal to give the instruction requested by stating distinctly the matter to which he objected and the grounds of his objection, as re-

3. Robert Hind, Limited v. Silva, 9 Cir., 75 F.2d 74, 77; Cleghorn v. Terminal Railroad Assn. of St. Louis, Mo., 289 S.W. 2d 13, 21; McCarthy v. Eddings, 109 Colo. 526, 127 P.2d 883, 885; Early v. Martin, 331 Ill.App. 55, 72 N.E.2d 562, 563; 76 C.J.S. Release § 25, p. 645.

quired by Rule 51 of the Federal Rules of Civil Procedure, and therefore he may not assert error with respect to the instructions given and refused.[4]

From the foregoing it will be seen that the issue submitted to the jury was whether at the time the release was executed Locke was suffering merely from sprains of muscles and ligaments, or whether he was then suffering from a ruptured vertebral disc or discs. Moreover, counsel for Locke tried the case on the theory that at the time the release was executed Locke was suffering from a ruptured vertebral disc or discs and he sought to establish that fact by the evidence which he adduced.

■ A motion for a new trial on the ground that the verdict of the jury is against the weight of the evidence is normally one of fact and not of law and is addressed to the discretion of the trial court and the decision of the trial court on such a motion will not be reviewed in the absence of a showing of abuse of discretion.[5]

■ In order to justify a court in setting aside the verdict of a jury, the verdict must be clearly, decidedly, or overwhelmingly against the weight of the evidence.[6]

Here, there was substantial evidence from which a jury might well have found that the ruptured discs from which Dr. Stuck testified Locke was suffering in October, 1959, and January, 1960, occurred after the release was executed in April, 1958.

■ We cannot say, on this record, that the trial court abused its discretion in denying the motion for a new trial on the ground that the verdict of the jury was contrary to the weight of the evidence.

■■ The granting of a separate trial on the issue of mutual mistake was authorized by Rule 42 of the Federal Rules of Civil Procedure and was a matter resting in the sound discretion of the trial court.[7] On this record, we cannot say the trial court abused its discretion. Moreover, counsel for Locke requested a separate trial on the issue of the release at the pretrial conference and may not now urge as error the granting of a separate trial.

■ Finally, Locke contends that the court erred in restricting Locke's evidence with respect to the circumstances leading up to and surrounding the injury. The record does not show that the court did so restrict Locke's evidence. The court did express the view that additional evidence with respect to such facts and circumstances would not be helpful, but when counsel for Locke stated that he was about finished with that phase of the evidence, the court stated that he might continue. No offer of additional proof was made and evidence of Locke's statement to Dr. Stuck, which fully described how the injury occurred, was admitted in evidence. Clearly, no prejudice resulted to Locke.

Affirmed.

---

4. Federated Mutual Imp. & Hardware Ins. Co. v. Fairfax Equip. Co., 10 Cir., 261 F.2d 207, 211; Richfield Oil Corporation v. Karseal Corporation, 9 Cir., 271 F.2d 709, 721, 722.

5. Moore's Federal Practice, Vol. 6, § 59.-15(3) p. 3902; Francis v. Southern Pac. Co., 10 Cir., 162 F.2d 813, 818, aff'd. 333 U.S. 445, 68 S.Ct. 611, 92 L.Ed. 798;

Aetna Casualty & Surety Co. v. Reliable Auto Tire Co., 8 Cir., 58 F.2d 100, 104.

6. Felton v. Spiro, 6 Cir., 78 F. 576, 582; 66 C.J.S. New Trial § 70, p. 209.

7. Bedser v. Horton Motor Lines, 4 Cir., 122 F.2d 406, 407; Bowie v. Sorrell, 4 Cir., 209 F.2d 49, 51, 43 A.L.R.2d 781; Larsen v. Powell, D.C.Colo., 16 F.R.D. 322, 323.