Billy R. PREBBLE, Plaintiff-Appellant,

v.

Gordon BRODRICK et al.,
Defendants-Appellees.

No. 74–1664.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 23, 1975.

Decided May 10, 1976.

[redacted]

Philip P. Whynott, Cheyenne, Wyo. (De-Herrera & Whynott, Cheyenne, Wyo., on the brief), for plaintiff-appellant.

Jerome F. Statkus, Asst. Atty. Gen., Cheyenne, Wyo. (David B. Kennedy, Atty. Gen. of Wyoming, Cheyenne, Wyo., and Joseph R. Geraud, Sp. Asst. Atty. Gen., Laramie, Wyo., on the brief), for defendants-appellees.

Before HILL, SETH and HOLLOWAY, Circuit Judges.

HOLLOWAY, Circuit Judge.

Plaintiff, Dr. Billy R. Prebble, brought this civil rights suit against the University of Wyoming, the Trustees and President of the University, the Dean of the College of Commerce and the Head of the Economics Department, alleging that the defendants violated his constitutional rights in discharging him from his position as an assistant professor of economics at the University.

Essentially the plaintiff claimed that the termination procedures followed in his case did not comport with procedural due process as guaranteed by the Fourteenth Amendment and that the defendants acted for constitutionally impermissible reasons in effecting the discharge, in violation of his First Amendment rights. The plaintiff averred that the defendants acted arbitrarily and maliciously, deprived him of property interests in his employment, injured his professional reputation and character, and held him up to public ridicule and scorn. His complaint pled only for damages.

The case was tried to a jury which returned a verdict for the remaining defendants after the trial court dismissed as to the University and directed a verdict for the members of the Board of Trustees. The plaintiff appeals from the judgment entered on the jury verdict, claiming error in

several rulings by the trial court and arguing that the verdict was clearly contrary to the evidence.

## I

### The background of plaintiff's employment and discharge

Prebble commenced teaching at the University at the beginning of the 1969–70 academic year. In April, 1972, during his third year at the University, he was notified that he had not been awarded tenure. Under University policy, faculty members denied tenure are granted a so-called "terminal year"—a final year during which they could continue teaching while seeking new employment.

Prebble began his final year in the Fall of 1972 at the onset of the 1972–73 academic year. He was scheduled to teach three economics sections during the Fall semester. Apparently on some eight days during that semester he did not conduct the scheduled classes in each course he was assigned, and he gave early final examinations near the end of the semester. On January 17, 1973, Prebble was conditionally relieved of all teaching responsibilities for the Spring semester. Effective March 3, Prebble was dismissed for neglect of duty on the basis of charges of failure to conduct scheduled classes during the Fall semester. Plaintiff's complaint concerns only this discharge which occurred during his terminal year.

The facts leading up to Prebble's discharge are generally as follows. Sometime in November, 1972, Prebble's absences came to the attention of defendant Dr. William Morgan, the acting Head of the Economics Department. Dr. Morgan discussed the situation with defendant Jakubauskas, the Dean of the College of Commerce and Industry, with Mr. Ranz, the Vice-President for Academic Affairs and with Mr. Geraud, the University's legal counsel. As a result of these consultations and after obtaining written statements from some of Prebble's students, Dr. Morgan recommended plaintiff's immediate termination to Dean Jakubauskas. In a letter to Dean Jakubauskas dated January 10, 1973, Dr. Morgan noted that the plaintiff "had been extremely delinquent regarding his teaching duties." (Defts. Ex. A). Dean Jakubauskas wrote to the plaintiff informing him of these allegations and requesting him to provide a justification as to why he should not be terminated for "gross neglect of duty." (Defts. Ex. B). The plaintiff replied that he was not grossly negligent in his teaching duties and demanded a hearing (Defts. Ex. D).

Shortly thereafter, Dean Jakubauskas recommended to the defendant President Carlson that the plaintiff be terminated effective January 31, 1973 (Defts. Ex. E). Defendant Carlson instructed the Tenure and Promotion Committee to conduct a hearing on the matter and requested the committee to answer two specified questions: (1) Did Dr. Prebble fail to conduct class sessions as charged? and (2) If so, does such conduct constitute neglect of duty? (Defts. Ex. J).

A hearing was held on February 21, 1973, before the Tenure and Promotion Committee. There is dispute over the hearing procedures followed and the evidence on this point will be detailed later. At the hearing, Prebble said it seemed correct to him that he did not conduct any of his three classes on eight different dates or on the regularly scheduled final exam dates. Prebble said some absences occurred while he was interviewing for a new position and some while he was elk hunting. In each instance the students were notified in advance and instructed to study certain material. At the court trial, Prebble said he did not know the number of absences, since he did not keep records; but that he never missed teaching. He contended he taught every class, although he was physically absent from some sessions during job interviews, and twice while hunting.

The committee found that, by his own admission, Prebble did not conduct any of his three classes on at least eight given dates or on the final examination date of the semester. The committee by a vote of 13–0, with one member abstaining, found that this conduct constituted neglect of

duty. It recommended that plaintiff be allowed to resign by a vote of 10 to 3, with one member abstaining (Defts. Ex. P, cover page).

President Carlson accepted the committee's recommendation and requested Prebble to submit his resignation by February 28, 1973 (Defts. Ex. R). The plaintiff refused to resign (Defts. Ex. S). On March 2, 1973, President Carlson wrote a long letter to Prebble summarizing all prior correspondence and communications and informing Prebble that as of March 3, 1973, he was dismissed from the faculty of the University. The letter explained that the regulations of the University provide for the termination of non-tenured faculty members for cause; that the responsibility for such dismissals had been delegated to the University President; that cause, namely neglect of duty, had been found in Prebble's case; and that he, President Carlson, was now exercising his responsibility (Defts. Ex. T).

The plaintiff argues that the discharge for alleged neglect of duty was merely a pretext for the dismissal. He contends that the termination occurred because plaintiff "did not conform to the Senior faculty's patterns and molds, all of which were personal and subjective." (Brief of Appellant, 31). Prebble insists that he was dismissed because he spoke out in faculty meetings, because he aligned himself with a department head who was about to be replaced and because he had a different philosophy of teaching than the concepts held by senior faculty members and department head Morgan. Id.

Plaintiff attempted to prove that the discharge amounted to a deprivation of his rights of expression and association as protected by the First Amendment. He also sought to show that the conduct of the hearing deprived him of procedural due process to which he claims entitlement.

A pre-trial motion to dismiss as to the University was granted; a motion to dismiss as to the other defendants denied. At trial, however, the court directed a verdict in favor of the Trustees on the ground that

the plaintiff had failed to sustain his burden of proof as to their liability. The case went to the jury only as to the three remaining defendants—President Carlson, Dean Jakubauskas and Dr. Morgan.

The trial court submitted three interrogatories to the jury. First, the jury was asked: "Did the defendants, William Carlson, Edward Jakubauskas and William E. Morgan act in good faith in terminating his contract?" The jury replied "yes." Second, the jury was asked "Did the defendants [the same names appear] act with malice to the plaintiff in terminating his contract?" The jury answered "No." Finally, the jury was asked: "Did plaintiff neglect his duties as a Professor in the Economics Department?" The jury did not answer this question. The jury also returned a general verdict in favor of defendants Carlson, Jakubauskas and Morgan. Judgment was entered on this verdict and a motion for a new trial was denied.

On appeal the plaintiff argues that the trial court erred (1) in dismissing the case against the University; (2) in directing a verdict for the Trustees; (3) in submitting the interrogatory on "neglect of duty" to the jury because this prejudicially interjected an issue into the case; (4) in instructing the jury on the University regulations; (5) in instructing the jury on the good faith and malice issues and in placing the burden of proof on the plaintiff, instead of treating them as an affirmative defense; (6) in selecting the verdict form used because it was prejudicial to the plaintiff. In addition, the plaintiff argues that the proof clearly shows that he was denied a due process hearing and was terminated for constitutionally impermissible reasons, so that the verdict was plainly contrary to the evidence and should have been directed in his favor.

II

*Dismissal as to the University*

By pre-trial motion the defendants moved to dismiss as to the University of Wyoming on the ground that sovereign immunity as interpreted in *Williams v. Eaton*, 443 F.2d

422 (10th Cir.) precluded an action against the University. The trial court sustained the motion.

In *Williams,* we construed the pertinent Wyoming statutes and constitutional provisions in light of the Eleventh Amendment. We found that the suit for damages against the Trustees of the University in their official capacities was equivalent to a suit against the State of Wyoming. We concluded that the State had not waived the Eleventh Amendment immunity and therefore the action for damages could not be maintained in the federal courts against the Trustees in their official capacities.

The circumstances of this case are similar to *Williams.* The plaintiff is a non-Wyoming citizen seeking damages from the University. The University is created under the Constitution of Wyoming, Art. 7, § 15, and is governed by a Board of Trustees appointed by the Governor with the advice and consent of the Senate. Art. 7, § 17. The University is funded by appropriations made by the State legislature. No expenditure may be made by the institution in excess of an appropriation and no money appropriated may be used for any purpose other than that for which it is appropriated. § 21–342, Wyo. Statutes of 1957.

Satisfaction of any damages awarded against the University would thus necessitate legislative appropriation of public monies, and a designation for that purpose. Where the recovery sought by the parties would "expend itself on the public treasury or domain . . .," *Land v. Dollar,* 330 U.S. 731, 738, 67 S.Ct. 1009,

1012, 91 L.Ed. 1209, 1216; *Ex parte New York,* 256 U.S. 490, 500, 41 S.Ct. 588, 590–91, 65 L.Ed. 1057, 1062, the action is essentially one against the State, as we observed in *Williams, supra,* 443 F.2d at 429. Plaintiff says that *Williams* has been modified by *Smith v. Losee,* 485 F.2d 334 (10th Cir.) and *Dewell v. Lawson,* 489 F.2d 877 (10th Cir.). These cases dealt, however, with suits against various State officers in their individual capacities, unlike plaintiff's claim here against the State University.[1] We conclude that as to the University the damage suit was barred by the Eleventh Amendment. *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662, 672–73.[2]

### III

*The claim of error in directing a verdict for the Board of Trustees*

At the close of all the evidence the trial court directed a verdict in favor of the defendant members of the Board of Trustees, commenting that there wasn't a "scintilla of evidence that the Board of Trustees officially or individually participated actively or passively or had anything to do with the termination of this contract." (Vol. VI, pp. 513–14).

The plaintiff alleged that the Trustees, as well as the other defendants, acted "intentionally" and "maliciously" in depriving him of his position and causing harm to his reputation. On appeal he argues that the regulations of the Board of Trustees placed responsibility for his termination on the Board once a hearing had been held. He

---

1. *Dewell v. Lawson, supra,* also involved a claim against the City of Oklahoma City, which was rejected on the ground that the City is not a person within the meaning of 42 U.S.C.A. § 1983. The remaining claim was against the Chief of Police in his individual capacity.

2. Of course, the Eleventh Amendment immunity may be waived by the State. No contention of waiver is made by plaintiff in this case. In *Williams,* we decided that the immunity of the Trustees of the University was recognized by the Wyoming statutes. The legislation specifically preserving immunity for the Board of Trustees as a State agency does not explicitly refer to the University as an agency of the

State. See § 1–1018, Wyo. Statutes of 1957. However, we are persuaded that the omission of specific reference to the University, as distinguished from the Board of Trustees, was not intended to waive immunity as to the University. Such a waiver must be by an express statutory provision, *Hjorth Royalty Co. v. Trustees of University of Wyoming,* 30 Wyo. 309, 222 P. 9, 11, and this is lacking here. Under Wyoming law we are persuaded that the institution is immune from suit, see *Retail Clerks Local 187 v. University of Wyoming,* 531 P.2d 884, 886 (Wyo.), and that there is no waiver of the Eleventh Amendment immunity.

says that the Board was aware of his case and failed to take action (Vol. VI, p. 503). And he says that the direction of a verdict in favor of the Trustees was erroneous because they "cannot hide liability behind a shield of inaction." (Brief of Appellant, 14).

We have examined the pertinent regulations of the University and find no provision placing responsibility for the dismissal of non-tenured faculty members on the Board of Trustees. Part V, Sec. 7 of the regulations does not discuss the dismissal of faculty members who are in their terminal year. Part of the regulation addresses dismissal of tenured faculty members; the final paragraph refers to the dismissal of faculty members during the probationary period. It is apparent that President Carlson treated Prebble as still within the probationary period and relied on the last paragraph in Part V, Sec. 7, in ordering his dismissal (See Vol. VI, pp. 457–62). The paragraph pertaining to the dismissal of non-tenured faculty members for cause makes no reference to any review by, or consultation with, the Trustees.[3] The paragraph confers the dismissal power on the University President and provides that he may order a hearing prior to *his* taking action under this authority.

At trial one of the defendant trustees, Mrs. Hickey, testified that the Board took no action on the termination of plaintiff's employment. Although the Board was advised of the action being taken at the University on plaintiff's employment, the matter was never discussed by the Board (Vol. VI, pp. 501–03). President Carlson confirmed the fact that the Board took no part in the proceedings leading up to the hearing, in the hearing itself, or in the termination of Prebble's services (Vol. VI, p. 491). There was no contradiction of such proof.[4] Thus no basis was shown for recovery against the trustees.

 We are convinced that the evidence points all one way and is susceptible of no reasonable inference sustaining the position of the plaintiff. *Lumbermen's Mutual Casualty Co. v. Rhodes,* 403 F.2d 2, 7 (10th Cir.), cert. denied, 394 U.S. 965, 89 S.Ct. 1319, 22 L.Ed.2d 567. The record is clear that the Trustees took no action, and inaction in these circumstances would not subject them to liability under § 1983. Hence the directed verdict for the Trustees in their individual capacities was proper. Insofar as recovery was sought against the Trustees in their official capacities, it was also proper that a verdict was directed for these defendants since such recovery is barred by the Eleventh Amendment. See *Williams v. Eaton,* 443 F.2d 422, 429 (10th Cir.).

IV

*The claim of error in the instruction on good faith and malice*

The trial court instructed the jury that:

**3.** The regulation, in pertinent part, provides (Deft. Ex. Z):

> During the probationary period, the President of the University may dismiss a faculty member for cause prior to the expiration of the contract period after consultation with the appropriate administrative and/or academic officers. The President, prior to acting may, if he determines it to be necessary or desirable, cause an investigation to be made and may order a hearing by the appropriate faculty committee in the manner set forth above.

**4.** The decision on denial of tenure was finalized by the Trustees, in accordance with the regulations, Part V, Secs. 3 and 4 (Defts. Ex. DD). In this connection Prebble testified that Vice President Ranz told him the original non-reappoint-

ment was his recommendation to President Carlson based on the Tenure and Promotion Committee's decision, but that it would be left to a decision by the Trustees. Prebble testified further that in the situation where he was fired ". . . that was strictly the recommendation of the President. It still had to be acted on by the Board of Trustees." (Vol. IV, 176). Prebble said the Trustees knew about the situation and sat back and said they were not going to act. He said they fired him and were the only ones who could fire him.

However, the regulations, the documentary proof and the testimony of Mrs. Hickey, the Trustee who testified, are clear that the Trustees had no part in the discharge of Prebble (See Part V, Sec. 7, of the regulation, quoted in part in note 3, *supra.)*

It is the burden of the Plaintiff to prove by a preponderance of the evidence that the termination was for constitutionally impermissible reasons, and that it was done with malice and lack of good faith. (Vol. VI, p. 564)

The plaintiff did not specifically object to this instruction although he did object to the court's definition of malice.[5] During deliberations the jury sent a note to the judge requesting that he read again the portion of the instructions that had to do with malice. The court complied with this request, reading the entire instruction set out above plus the definitions of good faith and malice that followed. Again, the plaintiff made no specific objection to the above language, although he renewed his earlier objections. The plaintiff now contends that this instruction erroneously placed the burden of proving an absence of good faith and the presence of malice on the plaintiff. Plaintiff argues that good faith and malice are an affirmative defense for the defendant to establish, citing *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90, and *Smith v. Losee,* 485 F.2d 334 (10th Cir.), cert. denied, 417 U.S. 908, 94 S.Ct. 2604, 41 L.Ed.2d 212, and that therefore the instruction was in error.

■ Generally a party may not assign an instruction as error unless he objects thereto before the jury retires, stating distinctly the matter to which he objects and the grounds of his objection. Rule 51, F.R. Civ.P.; *Miller v. Brazel,* 300 F.2d 283, 288 (10th Cir.). Although this court has the power to consider errors to which no objections were made, it is used sparingly and only in the interest of justice. *Pridgin v. Wilkinson,* 296 F.2d 74, 76 (10th Cir.). We do not feel that the circumstances here call for such exceptional review of objections that were not made at trial.

First, we note that plaintiff sought only damages for the alleged violation of his civil rights. *Wood v. Strickland,* 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214, recognized

a qualified immunity from such damages for school board members acting in the context of a school discipline case. The Court ruled that a school board member is not immune from damages under § 1983 if he knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the student, or if he took the action with the malicious intention to cause a deprivation of constitutional rights or other injury to the student; a compensatory award is appropriate only if he acted with such an impermissible motivation or with such disregard of the student's clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith. Id. at 322, 95 S.Ct. at 1000–01, 43 L.Ed.2d at 225.

■ We had earlier recognized in *Smith v. Losee,* 485 F.2d 334, 344 (10th Cir.), such a qualified privilege or immunity for school authorities making decisions on nonrenewal of employment or discharge of instructors. And we applied the qualified immunity, as more recently defined by the Supreme Court in *Wood,* in *Bertot v. School District No. 1, Albany County, Wyo.,* 522 F.2d 1171, 1184 (10th Cir.), where School Board members had exercised discretionary authority in teacher employment matters. We are satisfied that such a qualified immunity is available to the defendants in this case, the President, the Trustees and administrative officers of the State University.

Thus, the challenged instruction did not inject an improper issue. The question is whether the charge was in error in placing the burden of proof on the plaintiff. *Smith v. Losee, supra,* 485 F.2d at 344, does hold that the privilege is a defense that may be established by an affirmative showing of good faith and lack of malice by the defendant school officials. There is some controversy whether the Court's opinion in *Wood* indicates that the burden is instead on the plaintiff on the issue. Compare *Hander v.*

---

**5.** The only objection made was as follows (Vol. VI, 568):

We would prefer that the Court used our definition of malice and our proposed instructions as to the Court's.

*San Jacinto Junior College,* 519 F.2d 273, 277 n. 1 (5th Cir.), with *Zeller v. Donegal School District,* 517 F.2d 600, 612 (3d Cir.) (Seitz, Chief Judge, dissenting).

 We are satisfied, however, that we need not reach the question in this case since the evidence so strongly shows a lack of any malice or bad faith by defendants. Where the state of the evidence is such that a directed verdict against the appealing party would have been proper, an erroneous instruction would be harmless error under Rule 61 F.R.Civ.P. *Harris v. Quinones,* 507 F.2d 533, 538–39 (10th Cir.); see *O'Brien v. Thall,* 283 F.2d 741, 743 (2d Cir.). Based on our review of the evidence supporting plaintiff's discharge we are convinced that the proof is so strongly against him on the issue of malice and good faith that the interest of justice does not call on us to consider plaintiff's untimely objections.

## V

*The claim of error in the interrogatories and the form of general verdict submitted to the jury*

As stated, three written interrogatories were submitted to the jury together with a form for a general verdict. See Rule 49(b) F.R.Civ.P.[6] A first interrogatory on good faith and a second interrogatory on malice were answered favorably to defendants Carlson, Jakubauskas and Morgan. A third interrogatory asked: "Did plaintiff neglect his duties as a Professor in the Economics Department?" This last interrogatory was not answered. A general verdict was returned in favor of the three defendants named in the first two interrogatories.

Plaintiff argues that submission of the third interrogatory on neglect of duty prejudicially interjected an issue, which was not

involved, before the jury. He contends that the interrogatory focused the jury's attention on the issue of neglect of duty and slanted the case toward the defendants. He argues that the issue was not whether plaintiff was a good teacher but whether his constitutional rights were violated (Brief of Appellant, 15).

 We see no prejudice in the submission of the third interrogatory. It is true that the first two interrogatories and the general verdict sufficiently submitted the case and the question of neglect of duty was not a dispositive issue. Nevertheless, the issue of neglect ran through the entire case and was prominently before the jury at all times. We are satisfied that submission of the third interrogatory, although unnecessary, was not prejudicial. See *Ribeiro v. United Fruit Co.,* 284 F.2d 317, 321 (2d Cir.).

Plaintiff further argues that the form of the general verdict submitted was prejudicial because it did not permit a verdict for plaintiff unless the jury found liability on the part of all three remaining defendants —Carlson, Jakubauskas and Morgan.

 We must agree that the argument has theoretical merit since the plaintiff would be entitled, on a proper showing, to recover against any one or more defendants under § 1983. Here, however, the plaintiff's case throughout was premised on a claim of concerted action by the defendants to deprive the plaintiff of his civil rights (see Amended Complaint Vol. II, p. 411). His proof sought to establish a conspiracy to dismiss him without due process and in violation of his First Amendment rights. There is no claim or showing that the plaintiff's proof established a stronger case against any particular defendant than against any other. In these circumstances

---

**6.** The interrogatories and responses thereon by the jury read as follows (R. Vol. II, 513):

INTERROGATORIES

Did the defendants, William Carlson, Edward Jakubauskas and William E. Morgan act in good faith toward the plaintiff in terminating his contract? Yes_X_ No___

Did the defendants William Carlson, Edward Jakubauskas and William E. Morgan act with malice to the plaintiff in terminating his contract? Yes___ No_X_

Did plaintiff neglect his duties as a Professor in the Economics Department? Yes___ No___

/s/ Marvin Leff

Foreman.

we perceive no prejudice in the form of the general verdict used.

A further argument is made that an instruction of the trial court relating to the University regulations was prejudicially slanted against the plaintiff (Brief of Appellant, 16). Again, we cannot agree and find no prejudice in the charge by the trial court concerning the regulation and the surrounding circumstances.

In sum, we are satisfied that the claims of prejudicial error in submission of the case to the jury lack merit.

## VI

### The claim of denial of procedural due process

Plaintiff argues that the proof clearly established a denial of his rights to a proper hearing on the charges against him and the deprivation of related procedural rights in the termination of his employment. He says there were violations of his constitutional rights as recognized by *Board of Regents v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548, and similar cases, and that it was error to deny his motion for a directed verdict on this issue (Brief of Appellant, 20, 27).

At the outset, we note that plaintiff claims that "protected interests" in his employment as defined in *Roth,* supra, 408 U.S. at 569, 92 S.Ct. at 2705, 33 L.Ed.2d at 556, are involved here, so that under the principles of *Roth* he was entitled to procedural due process (Brief of Appellant, 20–21).[7] The defendants raise no question as to the presence of protected interests in this case, and argue only that the hearing and the procedures followed met the standard

of fairness as defined in *Fuentes v. Shevin,* 407 U.S. 67, 82, 92 S.Ct. 1983, 1995, 32 L.Ed.2d 556, 570–71 (Brief for Defendants-Appellees, 28–32). Since this question as to the plaintiff having protected interests is not put in issue by the parties, and is not briefed or argued, we do not decide that question. We focus instead on the issue which is joined—the constitutional sufficiency of the procedures followed by the defendants.

The plaintiff contends that the defendants determined to terminate his employment prior to affording him a hearing. Although he does not dispute the fact that a hearing was held on February 21, 1973, he argues that the decision to terminate his contract was finalized on January 10, 1973, and therefore he was discharged prior to any hearing. The plaintiff also says that the procedures used at the hearing did not comport in numerous respects with the requisites of due process.[8]

We cannot agree that the record shows that the decision to discharge plaintiff was actually made in January, 1973, and that the February hearing was "merely a courtesy." (Brief of Appellant, 21–22). It is true that a meeting was held on January 10 and plaintiff's situation was discussed between defendants Jakubauskas and Morgan. Vice-President Ranz and University counsel Geraud also attended this meeting. The outcome was an agreement that the plaintiff's absences constituted neglect of duty, if the information gathered by Dr. Morgan was correct. Therefore, procedures were initiated for a recommendation of dismissal.

On January 10 Dr. Morgan wrote a letter to Dean Jakubauskas recommending dis-

7. See id. at 572, 573, 576–77, 92 S.Ct. at 2706–07, 2708–09, 33 L.Ed.2d at 557–59, 560–61; *Weathers v. West Yuma County School District R–J–1, et al.,* 530 F.2d 1335 (10th Cir. 1976).

8. Plaintiff specified his claim of procedural deficiencies as follows:
 (a) he was not permitted discovery procedures,
 (b) he was not able to cross-examine witnesses,

 (c) witnesses were not available to Appellant,
 (d) the hearing was closed and not open to the public but, University Lawyer Geraud, Dean Jakubauskas and Dr. Morgan were present,
 (e) he was denied the power to subpoena witnesses and,
 (f) witnesses who would have been favorable to Appellant were not permitted into the "hearing". (Brief of Appellant, 20)

missal of the plaintiff (Defts. Ex. A). Morgan testified that he wrote the letter because he was responsible for initiating all actions on departmental faculty and staff. On January 10 Jakubauskas wrote a letter to Prebble, in response to Morgan's letter, informing the plaintiff that he intended to recommend dismissal, but that such recommendation would be withheld for seven days to afford plaintiff an opportunity to justify his conduct (Defts. Ex. B). Prebble's reply denied neglect of his teaching duties and demanded a hearing (Defts. Ex. D). When Dean Jakubauskas then wrote to President Carlson, it was in terms of a recommendation for dismissal (Defts. Ex. E).

It is apparent from these letters, and from subsequent letters from President Carlson to Prebble and to the hearing chairman, that a final determination of plaintiff's standing would not be made until after a hearing was conducted (See Defts. Exs. F, J). Furthermore, the suspension of the plaintiff from active teaching duties on January 17, 1973, was dependent on a "final determination" of his status and did not assume that he was then permanently dismissed. (See Defts. Ex. C). And we note that after the hearing, President Carlson's notice of termination rejected the recommendation for dismissal as of January 31, 1973 and set the termination date as of March 3, 1973 (Defts. Ex. T).

We cannot agree that the actual termination decision was made prior to the hearing. While it is clear that defendants Jakubauskas and Morgan had decided to recommend plaintiff's dismissal before a hearing, their actions were only part of the procedures that led to the hearing by the committee. President Carlson's action on its findings followed.

The plaintiff argues further that the procedures at the hearing did not meet the minimum requirements of due process. Specifically, the plaintiff complains that he was not permitted discovery, that he was not able to cross-examine witnesses, that the hearing was not open to the public, and that certain witnesses were not available to the plaintiff either because of lack of subpoena power, or because the witnesses were not permitted into the hearing (Appellant's Brief at 20).

We start with the premise that "consideration of what procedures due process may require under any given set of circumstances must begin with a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action" *Cafeteria & Restaurant Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230, 1236. We find no controlling decision of the Supreme Court or of this court which has staked out the procedural route that must be followed in a case like this. Hence we must evaluate the sufficiency of the procedures under the general guidelines from analogous cases and decisions of other courts.

The procedures followed in plaintiff's case were essentially the following. He was notified on January 10, 1973, of the recommendation of Dean Jakubauskas for his dismissal, the grounds for the recommendation, and he was informed that he had seven days to respond with any justification for his failure to meet classes (Defts. Ex. B). He was relieved of teaching responsibilities on January 17. On that date plaintiff replied to Dean Jakubauskas, denying neglect of duty and demanding a hearing. On January 26 President Carlson notified plaintiff that a hearing would be held by the Tenure and Promotion Committee (Defts. Ex. I).

On January 30 plaintiff made a written demand for a more detailed account of the charges and a statement as to why they constituted gross neglect of duty (Defts. Ex. K). On February 1 President Carlson replied that the charge was sufficiently stated; that he should be prepared to rebut the allegation of missing classes and the substantiation the administration had; that he, Carlson, had requested the committee to advise him whether Prebble had failed to conduct classes as charged, and if so whether such conduct constituted neglect of duty; and that he had been advised that the com-

mittee had set February 21 as the hearing date (Defts. Ex. L).

Plaintiff attended the hearing with another faculty member, Mr. Williams, who acted as his counsel. The Committee of 14 members were faculty and administrative representatives who are not shown to have participated in the prior investigation.

At the hearing, Dean Jakubauskas and Dr. Morgan submitted written and oral statements concerning Prebble's failure to conduct classes, the giving of early examinations and specifying the dates of absences. Corroborating written statements from several students were produced. Prebble's counsel, Williams, cross-examined Jakubauskas and Morgan, made numerous objections, including a hearsay objection to the students' written statements, and made a closing statement for Prebble. Prebble testified, explaining that such absences were not unusual for faculty members and were necessitated because he had to interview for a new position. Four student witnesses testified for Prebble, saying the absences were somewhat less than the number charged, that the course material was covered and the subject was well taught. However, Prebble stated that it seemed correct that he was not present for his classes on eight dates.

As stated, the committee found that Prebble admitted absences from his classes on eight dates and that this constituted neglect of duty. The committee recommended that Prebble be allowed to resign. The committee's findings were stated in a letter to President Carlson dated February 23, and this letter was in turn forwarded to Prebble with a letter from Carlson on February 27, requesting Prebble's resignation.

■ In the context of a proceeding looking toward dismissal of a professor for neglect of duty we feel that the procedures followed here were proper and necessary,

and were sufficient. Plaintiff was given notice of the charges and an opportunity to present his side of the story, after his general denial of the charges. See *Goss v. Lopez,* 419 U.S. 565, 581, 95 S.Ct. 729, 739–40, 42 L.Ed.2d 725, 738–39; *Ferguson v. Thomas,* 430 F.2d 852, 856 (5th Cir.). He was permitted to have counsel present at the hearing. He was permitted to confront and cross examine witnesses appearing against him. He was given the right to testify himself and to present witnesses in his behalf. At Prebble's request an AAUP observer was present at this hearing. Prebble was furnished a written decision stating the reasons for the committee's conclusion.

There are objections that Prebble was not allowed to learn the names of the students whose statements were produced by Dean Jakubauskas and Dr. Morgan, or to cross-examine them.[9] Where such information from persons not produced at the hearing concerns an important issue in dispute, these objections might well be valid. However, they are not persuasive here in view of the admissions by Prebble on the key issue at the hearing (See Defts. Ex. P, at 25). It was these admissions on which the committee's findings, and in turn Dr. Carlson's decision, were essentially based. Thus the objections lose their force. See *McNeill v. Butz,* 480 F.2d 314, 326 (4th Cir.).

Weighing both the nature of the governmental function involved and the private interest affected, *Cafeteria Workers v. McElroy, supra,* 367 U.S. at 895, 81 S.Ct. at 1748–49, 6 L.Ed.2d at 1236, in the context of this case we are satisfied that the procedures followed afforded procedural due process.[10]

## VII

### *The First Amendment claim*

■ Plaintiff further claims that his termination was not actually for failure to

---

**9.** We read the administrative record as reflecting that the written statement of Dr. Morgan, to which the students' statements were attached, was in Dr. Prebble's hands at the hearing (Defts. Ex. P, p. 4).

**10.** We do not, of course, decide that other procedural rights may not be of critical importance in similar cases, *e. g.,* cross-examination of a crucial witness. We decide only that none of the elements of procedural due process which were essential here were denied.

conduct classes, but because of his speaking out in faculty committees and his association with a department head (Pikl) who was about to be replaced, thus amounting to a First Amendment infringement, citing *Rampey v. Allen,* 501 F.2d 1090 (10th Cir.).[11] He points to the fact that he was not warned of the administration's concern about his absences, nor told to correct his conduct.[12] He also refers to his proof that other faculty members were not dismissed for missing classes or for giving early examinations.[13]

These arguments would be relevant to buttress a showing of a discharge for exercise of constitutional rights, but that basic proof was never made. It was incumbent on the plaintiff to establish that his exercise of First Amendment rights was the reason for his discharge. *Adams v. Campbell County School District,* 511 F.2d 1242, 1246 (10th Cir.). Prebble did present some substantial proof of his excellence as an economics professor and that he was a fine person to associate with (*e. g.,* testimony of Dr. Pikl, Head of the Economics Department).[14] But § 1983 is not a vehicle for federal court correction of errors, committed by school administrators in the exercise of their discretion, not rising to the level of violation of specific constitutional guarantees. See *Wood v. Strickland, supra,* 420 U.S. at 326, 95 S.Ct. at 1003, 43 L.Ed.2d at 227–28.

Here Prebble's only proof touching on his First Amendment claim was that he had spoken out in some faculty meetings and associated with some faculty members who disagreed with their superiors, and with Dr. Pikl, who was replaced. But there was no showing that the defendants objected to this conduct. Unlike *Rampey,* here it is only surmise that his discharge was in retaliation for his statements or associations. The proof is clearly not all one way in his favor and susceptible of no inferences to sustain the defendants' position, and thus in no event did it justify the directed verdict which plaintiff says he was entitled to. *Bertot v. School District No. 1,* 522 F.2d 1171, 1178 (10th Cir.).

A final argument is made that the trial court erred in denying a new trial. No basis was shown for the motion and plaintiff in no way demonstrated that the verdict was clearly or overwhelmingly against the weight of the evidence, as he must to prevail on the motion. *Locke v. Atchison, Topeka & Santa Fe Ry. Co.,* 309 F.2d 811, 817 (10th Cir.).

We are satisfied that no reversible error is shown which would call for disturbing the verdict and the judgment of the trial court, and we accordingly affirm.

---

11. This First Amendment claim is, of course, an independent constitutional claim which must be considered regardless of the tenured or non-tenured status of the teacher. *Perry v. Sindermann,* 408 U.S. 593, 596–98, 92 S.Ct. 2694, 2696–98, 33 L.Ed.2d 570, 576–78; *Bertot v. School District No. 1, Albany County, Wyoming,* 522 F.2d 1171, 1177 (10th Cir.).

12. In this connection we note that a supplementary recommendation was made by the Tenure and Promotion Committee in which eight committee members concurred. It was to the effect that " . . . in future similar cases discussions should be held in depth between the faculty member and appropriate administrative officers with the intent to effect a mutual understanding of responsibility and a correction of the improper behavior prior to a notification of intent to dismiss for cause." (Defts. Ex. P).

13. Two other faculty members did testify that they were not discharged although they also had absences, which were somewhat fewer than Prebble had (Vol. IV, 150–51; 159–60).

14. There was also testimony by another faculty member, Petersen, that Prebble's discharge was only ostensibly for the absences. He indicated that the actual reason was that Prebble was investigating private matters of other faculty members, the making of consultation fees by them.