**Lecil HANDER, Plaintiff-Appellee,**

v.

**SAN JACINTO JUNIOR COLLEGE et al., etc., Defendants-Appellants.**

No. 74–2279.

United States Court of Appeals, Fifth Circuit.

Sept. 12, 1975.

Rehearing and Rehearing En Banc Denied Oct. 29, 1973.

See 522 F.2d 204.

B. Jeff Crane, Jr., Francis E. McGovern, II, Houston, Tex., for defendants-appellants.

Larry Watts, Houston, Tex., Stephen J. Pollak, David Rubin, Washington, D. C., for plaintiff-appellee.

Before BROWN, Chief Judge, and GEWIN and THORNBERRY, Circuit Judges.

GEWIN, Circuit Judge:

This case involves the right of a public junior college to impose grooming standards on its faculty. The dispute requires that we determine the applicability of *Lansdale v. Tyler Junior College*, 470 F.2d 659 (5th Cir. 1972) (en banc), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2268, 36 L.Ed.2d 964 (1973), a case invalidating unreasonable regulation of college students' hair styles, to the regulation of the appearance of college teachers.

### I

The appellee Hander began teaching at the appellant San Jacinto Junior Col-

lege, a public "union junior college", V.T. C.A., Tex.Educ.Code § 130.031, in August 1969. At that time, the college had written regulations prohibiting male students from wearing long hair and beards, but officials had a tacit understanding with the faculty that the rule applied with equal force to instructors and other employees. In November 1969, a federal district court declared the student grooming policy to be violative of the First and Fourteenth Amendments. *Calbillo v. San Jacinto Junior College*, 305 F.Supp. 857 (S.D.Tex.1969). On appeal, this court did not reach the merits of the controversy, but remanded the cause for a determination of whether the case was moot because of the complaining student's withdrawal from school and expungement from his record of references to his suspension. 434 F.2d 609 (5th Cir. 1970). On December 31, 1970, the district court, apparently deciding that the case was moot, dissolved the preliminary injunction against the college and dismissed the complaint.

On December 22, 1970, the college's Board of Regents resurrected the regulation concerning male students' hair which had been the subject of the *Calbillo* case and simultaneously promulgated the following regulation governing faculty appearances:

> Faculty members and all of the male employees of San Jacinto Junior College are required to be clean shaven, wear reasonable hair styles and have no excessively long sideburns.

Hander had grown a beard during the summer of 1970 and has worn it ever since. In January 1971 he was personally informed by the college's president that his beard violated the newly enacted policy, and at his request, the Board of Regents conducted a hearing on January 14, 1971 to determine what action to take against him. The Board gave Hander four days in which to shave his beard or be discharged. He refused to comply and was immediately dismissed, although he was paid the remainder of his salary for the 1970–71 term.

Hander sued under 42 U.S.C. § 1983 for reinstatement in his job, a permanent injunction against continued enforcement of the faculty grooming regulation, and backpay. He based his cause of action on the due process and equal protection clauses of the Fourteenth Amendment, asserting that the regulation was designed to implement the personal tastes of the college administrators and as such bore no relation to their statutory authority to manage the college and that the grooming standard created an arbitrary classification. He did not contend that the regulation violated his right of either free expression or privacy. The district court invoked the abstention doctrine and dismissed the complaint. *Hander v. San Jacinto Junior College*, 325 F.Supp. 1019 (S.D.Tex.1971), but we reversed and remanded the case for consideration in light of our decision in *Lansdale v. Tyler Junior College, supra*, a case dealing with the right of college students to wear long hair. 468 F.2d 619 (5th Cir. 1972). The district court subsequently ruled that although the college acted in good faith, Hander's Fourteenth Amendment rights were violated by the discharge which was based solely on his refusal to shave his beard. The court additionally found that Hander had a legitimate objective expectancy and entitlement to continued employment during subsequent school terms and that the Board of Regents' failure to rehire him therefore denied him a property right guaranteed by the Fourteenth Amendment. The district court consequently ordered that the defendant college reinstate Hander and pay him $11,-321.70 in backpay. Hander was also awarded $5,112.50 in attorneys' fees.

On appeal, the appellant junior college contends that teachers in public institutions enjoy no constitutionally protected right to wear beards, that the Eleventh Amendment bars recovery of backpay and attorneys' fees, and that an award of attorneys' fees is inappropriate in the circumstances of this case. We affirm in part and reverse in part, finding that the discharge did infringe upon Hander's

constitutional rights and that there is no constitutional bar to the backpay award, but that attorneys' fees are not permissible under the facts and in the circumstances of this case.

## II

The seminal case involving grooming regulations in the college environment is *Lansdale v. Tyler Junior College, supra,* in which we held that absent unusual circumstances, the regulation of the length of a male college student's hair is irrelevant to any legitimate educational or administrative interest and creates arbitrary classifications of college students and therefore violates both the due process and equal protection clauses of the Fourteenth Amendment. The *Lansdale* decision differentiated between the college and high school settings and concluded that while grooming restrictions for high school students might be permissible, see *Karr v. Schmidt,* 460 F.2d 609 (5th Cir. 1972) (en banc), *cert. denied,* 409 U.S. 989, 93 S.Ct. 307, 34 L.Ed.2d 256 (1972), regulation of college students' tonsorial styles was not rationally related to educational objectives.

The college seeks to distinguish the *Lansdale* decision since it prohibits arbitrary grooming regulations for junior college students while this case concerns regulation of junior college faculty members. The underlying theory of *Lansdale,* the college argues, is that an unreasonable grooming regulation might deny a hirsute student access to a public education. It contends that dismissal for violation of a faculty grooming standard does not deny Hander any right whatsoever, and that regulation of a public employee's appearance is recognized as a legitimate exercise of statutory authority. The college, in effect, argues that our decision in this dispute is controlled by cases upholding a public institution's right to regulate the appearance of its employees, and not by those cases dealing with students' grooming standards. Additionally, it argues that regulation of faculty members' appearance is significant to the maintenance of high educa-

tional standards. The first argument misperceives the import of both the *Lansdale* decision and the public employee cases on which the college relies. The second contention is unsupported by the record.

While the *Lansdale* decision dealt with junior college students and not teachers, the significant aspect of that case was the distinction between the high school and college environments. While we acknowledged that the application of differing legal standards to circumstances often separated only by several months was sometimes arbitrary, we nonetheless concluded that as a general rule, the maturity of college students and the marginal relation of a college student's hirsute appearance to administrative and educational processes rendered grooming restrictions in institutions of higher learning constitutionally impermissible. Thus, although *Lansdale* itself applies to college students, its underlying rationale strongly supports Hander's position. As Judge Clark, writing for the court, observed:

> Today the court affirms that the adult's constitutional right to wear his hair as he chooses supersedes the State's right to intrude.

470 F.2d at 663. If college freshmen are treated as members of the adult population, college teachers a fortiori enjoy this status. See *Conrad v. Goolsby,* 350 F.Supp. 713 (N.D.Miss.1972).

The plethora of public employee cases on which the college relies does not provide convincing precedent for this case. In the majority of cases in which federal courts have upheld dismissals in the face of constitutional challenges, the public employer has presented evidence of a compelling interest in enforcing the grooming regulation in question. In *Yarbrough v. City of Jacksonville,* 363 F.Supp. 1176 (M.D.Fla.1973), *aff'd* memo, 504 F.2d 759 (5th Cir. 1974), for example, the city offered evidence that beards and long hair might interfere with the proper wearing of a fireman's oxygen mask. Cases upholding a city's or state's right

to regulate the appearance of policemen or firemen recognize the need for establishing discipline and maintaining the public's confidence in employees working in such sensitive and highly visible roles. See, e. g., *Stradley v. Andersen*, 478 F.2d 188 (8th Cir. 1973). Teachers, even at public institutions such as San Jacinto Junior College, simply do not have the exposure or community-wide impact of policemen and other employees who deal directly with the public. Nor is the need for "discipline" as acute in the educational environment as in other types of public service.

 The college's attempt to justify its grooming regulation on educational grounds is equally unpersuasive. School authorities may regulate teachers' appearance and activities only when the regulation has some relevance to legitimate administrative or educational functions. *E. g., Fisher v. Snyder*, 476 F.2d 375 (8th Cir. 1973). In this case, the college contends that the wearing of a beard diminishes the respect which a teacher must have from his students and "the community" in order to properly perform his duties. The college, however, presented no evidence whatsoever to support this position, other than to suggest that the Board of Regents somehow determined that a clean shaven appearance by faculty members was necessary in order for the college, a public institution, to properly serve the community. The mere subjective belief in a particular idea by public employers is, however, an undeniably insufficient justification for the infringement of a constitutionally guaranteed right. Appel-

lant offers no evidence as to why the opinion of "the community" is in any way related to the teaching process. Furthermore, it is illogical to conclude that a teacher's bearded appearance would jeopardize his reputation or pedagogical effectiveness with college students, particularly in view of our *Lansdale* decision which guarantees those students the right to wear their hair and beards in any style they choose.

In view of these considerations, the district court correctly concluded that Hander's discharge was constitutionally impermissible.

### III

 Having determined that Hander was dismissed in contravention of the Fourteenth Amendment, we now address the validity of the equitable and monetary relief ordered by the district court. The injunctive order requiring that he be reinstated is clearly within the district court's equitable power and the college does not now challenge the authority for such relief. The college does contend, however, that the award of backpay and attorneys' fees is barred by the Eleventh Amendment.[1] Hander counters that San Jacinto Junior College is not immune from the imposition of such remedies since it is not an alter ego of the state but rather enjoys local, independent power to raise revenues and satisfy adverse monetary judgments.

 The Eleventh Amendment, enacted to protect state treasuries from suits by individuals, prohibits an award of damages which is in substance against the state.[2] *Edelman v. Jordan*, 415 U.S.

---

1. Appellant also argues strenuously that *Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975) and *Sapp v. Renfroe*, 511 F.2d 172 (5th Cir. 1975) preclude the backpay award in this case. *Wood*, applied by this circuit in *Sapp v. Renfroe*, established the principle that an individual school board member is not personally liable for damages under § 1983 unless the plaintiff can establish a "malicious intention to cause a deprivation of constitutional rights or other injury to the student." 420 U.S. at 322, 95 S.Ct. at 1001, 43 L.Ed.2d at 225. The college contends that the

district court's finding that Hander was discharged in good faith precludes a damages remedy. The *Wood* rationale, however, is inapplicable to the instant case because the backpay award is entered against San Jacinto Junior College itself and not against the individual members of the Board of Regents.

2. The state may, of course, waive its Eleventh Amendment immunity by giving its consent to being sued. *Parden v. Terminal Ry. of Ala. State Docks Dept.*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964); *Petty v. Tennessee-Mis-*

651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1972); *Kennecott Copper Corp. v. State Tax Comm'r,* 327 U.S. 573, 66 S.Ct. 745, 90 L.Ed. 862 (1946); *Ford Motor Co. v. Department of the Treasury,* 323 U.S. 459, 65 S.Ct. 347, 89 L.Ed. 389 (1945). In the recent case of *Edelman v. Jordan, supra,* the Supreme Court categorized types of remedies imposed against the state according to the temporal effect of such relief. If an award against the state is "prospective", it is permissible; if it is "retroactive", necessitating an invasion of the state treasury to compensate for past misfeasance, it runs afoul of the Eleventh Amendment. Applying this rationale, the *Edelman* Court ruled that a state could be enjoined from wrongfully denying welfare benefits in the future, but could not be required to compensate welfare recipients for past denials of benefits. See also *Rothstein v. Wyman,* 467 F.2d 226 (2d Cir. 1972), *cert. denied,* 411 U.S. 921, 93 S.Ct. 1552, 36 L.Ed.2d 315 (1973).

█ We have little difficulty in concluding that backpay, whether viewed as damages for illegally terminated employment or as an aspect of equitable relief, is, like payment of wrongfully denied welfare payments, "retroactive" in nature. Hander tacitly concedes this point, but argues nonethless that the Eleventh Amendment does not constitute a bar to the district court's backpay remedy since the award is not made against the state but rather against a junior college district which is local and independent in nature. He contends that the Eleventh Amendment shields the state from monetary remedies only when it is the "real party in interest" and that political subdivisions do not enjoy constitutional immunity from such awards. Under the

peculiar Texas statutory and decisional law governing junior college districts, he argues, such entities are not alter egoes of the state but are primarily local institutions, created by local authority and supported largely by local revenues. We find this argument persuasive and affirm the district court's award of backpay.

It is a cornerstone of Eleventh Amendment jurisprudence that the amendment restricts federal court jurisdiction only in those cases in which the state is the real party in interest. While Mr. Chief Justice Marshall's pronouncement in *Osborn v. Bank of the United States,* 9 Wheat. 738, 857, 22 U.S. 738, 6 L.Ed. 204, 232, that the Eleventh Amendment governs only "those suits in which the State is a party on the record" has since been relaxed, the cases nonetheless require that the state be "a real, if not a nominal defendant." *Lincoln County v. Luning,* 133 U.S. 529, 530, 10 S.Ct. 363, 33 L.Ed. 766 (1890). See also *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Ford Motor Co. v. Department of the Treasury, supra*; *Hopkins v. Clemson Agricultural College of South Carolina,* 221 U.S. 636, 31 S.Ct. 654, 55 L.Ed. 890 (1911); *Ex parte Ayers,* 123 U.S. 443, 8 S.Ct. 164, 31 L.Ed. 216 (1887). Yet this same line of cases which establishes that plaintiffs may not circumvent Eleventh Amendment immunity by suing an official or a governmental entity which, in effect, stands in the shoes of the state itself, recognizes that mere "political subdivisions" of the state do not enjoy constitutional immunity. *Edelman v. Jordan, supra,* 415 U.S. at 667, n. 12, 94 S.Ct. 1347, 39 L.Ed.2d at 675; *Hopkins v. Clemson Agricultural College of South Carolina,*

---

*souri Bridge Comm'n,* 359 U.S. 275, 79 S.Ct. 785, 3 L.Ed.2d 804 (1959). *Cf. Great Northern Life Insurance Co. v. Read,* 322 U.S. 47, 64 S.Ct. 873, 88 L.Ed. 1121 (1945). The appellee does not contend, nor do we find, that the backpay award in this case is justified on a waiver theory. Texas law provides that independent school districts may "sue or be sued", Tex.Educ.Code, § 23.26(a), V.T.C.A., but does

not specify similar consent for junior college districts. Moreover, the state's establishment of a junior college system, unlike the operation of a typically non-governmental entity, such as a railroad, see *Parden v. Terminal Ry. of Ala. State Docks Dept., supra,* is a routine governmental function. See, *e. g., Dealey v. Dallas County Junior College Dist.,* 434 S.W.2d 724 (Tex.Civ.App.1968).

*supra*; *County of Lincoln v. Luning, supra.*

In Eleventh Amendment cases, the question of whether or not the state is "the real party in interest" is one of federal law, but federal courts must examine the powers, characteristics and relationships created by state law in order to determine whether the suit is in reality against the state itself. *Aerojet-General Corp. v. Askew,* 453 F.2d 819 (5th Cir. 1971). An analysis of the statutory authority for establishing, funding, and operating junior college districts in Texas and state decisional law construing that authority reveals that these districts are, within the Eleventh Amendment context, independent political subdivisions not immune from suit.

While the statutory scheme governing the public junior colleges of Texas authorizes a system-wide "coordinating board" to "exercise general control" over such institutions, it explicitly provides that all residual administrative authority is retained in the individual junior colleges:

> All authority not vested by this chapter or by other laws of the state in the coordinating board or in the Central Education Agency is reserved and retained locally in each of the respective public junior college districts or in the governing boards of such junior colleges as provided in the laws applicable. V.T.C.A., Tex.Educ.Code § 130.002.

Furthermore, the establishment of a "union junior college district," V.T.C.A., Tex.Educ.Code § 130.031, the category in which San Jacinto Junior College apparently falls, begins with local initiative. Citizens of a particular locale first petition their county school board for the creation of a junior college, V.T.C.A., Tex.Educ.Code § 130.033(b), and the school board, in turn, forwards the petition to the state coordinating board. If that body determines that the establishment of a junior college would benefit the state as a whole as well as the community involved, a district-wide referendum is held. V.T.C.A., Tex.Educ.Code § 130.037. The district electorate simultaneously selects the board of trustees to operate the college should its establishment be approved. V.T.C.A., Tex.Educ. Code §§ 130.041, 130.042, 130.082. The Texas statutory scheme empowers the junior college trustees to issue revenue bonds and to levy annual ad valorem taxes, both to pay the principal and interest on these bonds and to provide for "the further maintenance of [the] public junior college . . . ." V.T.C.A., Tex. Educ.Code, § 130.122. See also V.T.C.A., Tex.Educ.Code, § 130.123. While the state does biennally appropriate money from the state treasury for junior college districts, the state code specifically provides for appropriation of "an amount sufficient to *supplement* local funds for the proper support, maintenance, operation and improvement" of the junior colleges. V.T.C.A., Tex.Educ.Code § 130.-003(a) (emphasis added). Furthermore, although the state code insures that state monies "shall be used exclusively for the purpose of paying salaries of [instructors and administrators] and the purchase of supplies and materials for instructional purposes", V.T.C.A., Tex. Educ.Code § 130.003(c), it does not require that salaries be paid from state rather than local funds.

The Texas common law concerning independent school districts [3] has consistently recognized that these governmental units are, like municipalities, independent political corporations, distinct from the state itself. As the Texas Supreme Court has observed, "[s]chool districts are local public corporations of the same general character as municipal corporations," and "the property and funds of the public schools are held in trust by

---

**3.** The appellee correctly observes that junior college districts in Texas enjoy the same legal and constitutional status as "independent school districts." The Texas Education Code § 130.122(f) specifically provides that each junior college district is "declared to be, and constituted as, a school district" as defined in the Texas Constitution. See also V.T.C.A., Tex.Educ.Code § 130.084.

the . . . district . . . for the benefit of the school children of the . . . district." *Love v. City of Dallas,* 120 Tex. 351, 40 S.W.2d 20, 26 (1931). Another Texas court reaffirmed this conclusion, noting that "[s]chool districts . . . are not primarily agencies of the state, but they are local public corporations of the same general character as municipal corporations." *Hatcher v. State,* 125 Tex. 84, 81 S.W.2d 499, 500 (1935). See also *Harkless v. Sweeny Independent School District,* 427 F.2d 319 (5th Cir. 1970); *Lewis v. Independent School Dist., City of Austin,* 139 Tex. 83, 161 S.W.2d 450 (1942). *Cf. DuPuy v. State,* 135 Tex.Cr.R. 595, 121 S.W.2d 1003 (1938).

## IV

In addition to the order reinstating Hander in his job and the award of damages constituting backpay, the district court awarded him $5,112.50 in attorneys' fees. In its informal findings of fact, that court stated simply that attorneys' fees are proper "in these type of cases", referring apparently to decisions enforcing the constitutional rights of public employees. We reject this notion and reverse the award of attorneys' fees, both because such an award is inappropriate in the circumstances of this case and because it does not fall within any of the exceptions to the "American Rule" that each party bear the expense of the litigation of a lawsuit.

As we suggested in *Roane v. Callisburg Independent School District,* 511 F.2d 633 (5th Cir. 1975), the successful invocation of § 1983 is in itself insufficient to justify an award of attorneys' fees. While the grooming regulation invalidated in this case did apply to all teachers and employees at San Jacinto Junior College, this was not a situation "in which a damage award was unlikely or in which the costs of proving a case for injunctive relief were disproportionately high." *Roane v. Callisburg Independent School District, supra,* at 641.

Moreover, even if the class implications of this dispute argued for an award of attorneys' fees to the prevailing plaintiff, there is no legal basis for such an order. In *F.D. Rich Co., Inc. v. Industrial Lumber Co.,* 417 U.S. 116, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974), the Supreme Court identified three instances in which federal courts have fashioned exceptions to the rule precluding recovery of such fees in the absence of some statutory or contractual authorization:

We have long recognized that attorneys' fees may be awarded to a successful party when his opponent has acted in bad faith, vexatiously, wantonly, or for oppressive reasons, or where a successful litigant has conferred a substantial benefit on a class of persons and the court's shifting of fees operates to spread the cost proportionately among the members of the benefited class. The lower courts have also applied a rationale for fee shifting based on the premise that the expense of litigation may often be a formidable if not insurmountable obstacle to the private litigation necessary to enforce important public policies [the "private attorney general" rationale].

417 U.S. at 129–30, 94 S.Ct. at 2165, 40 L.Ed.2d at 714. The facts of this litigation clearly do not support an award under the "obdurate obstinacy" theory. Compare *Bassett v. Atlanta Ind. School Dist.,* 485 F.2d 1268 (5th Cir. 1973), with *Rainey v. Jackson State College,* 481 F.2d 347 (5th Cir. 1973). The district court specifically found that the college acted in good faith in enforcing its groooming regulation and that Hander's discharge resulted solely from his refusal to comply with that regulation. Hander must therefore justify the attorneys' fees award on either the common benefit theory or the "private attorney general" rationale.

The appellee relies on *Hall v. Cole,* 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973) and *Mills v. Electric Auto-Lite*

*Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970) for the proposition that in instances in which successful litigation confers a significant benefit on members of a class, a court may, in its discretion, spread the cost of litigation among those who benefit from it. The suit he has brought, however, clearly differs from the disputes underlying those cases. In *Mills v. Electric Auto-Lite,* the corporate defendant and the shareholders as a group were benefited by a successful shareholder suit brought to set aside a corporate merger based on the use of misleading proxy statements. In *Hall v. Cole,* the Supreme Court upheld an award of attorneys' fees in a situation in which a union member's successful suit against his union for denying his right of free speech guaranteed by the Labor Management Reporting and Disclosure Act was deemed to render a substantial service both to the union itself and all of its members. In the instant case, the costs were not spread among those who would profit from the litigation—other teachers and employees—and the party against whom the district court assessed the attorneys' fees—the college—hardly derived any benefit from the invalidation of the grooming regulation.

The only remaining rubric on which to base an award of attorneys' fees is the "private attorney general" theory. This exception to the "American Rule", heretofore embraced by a variety of federal tribunals, including this court, see, *e. g., Cooper v. Allen,* 467 F.2d 836 (5th Cir. 1972); *Lee v. Southern Home Sites Corp.,* 444 F.2d 143 (5th Cir. 1971), has been expressly disapproved by the Supreme Court in *Alyeska Pipeline Service Co. v. Wilderness Society,* 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975). In that case, various environmental organizations which attempted to prevent federal authorization of construction of the trans-Alaska oil pipeline sought attorneys' fees from Alyeska, a subsidiary of the consortium of oil companies wishing to build the pipeline, on the theory that the environmentalists were protecting the interests of the public by bringing suit. The Court denied this relief, reasoning that only Congress has the power to authorize attorneys' fees for private parties seeking to enforce federal statutory policy. The *Alyeska* case expressly disavowed prior holdings of this court which based awards of attorneys' fees on the private attorney general rationale. 421 U.S. at 270, n. 46, 95 S.Ct. 1612, 44 L.Ed.2d at 160. See *Cornist v. Richland Parish School Board,* 495 F.2d 189 (5th Cir. 1974); *Fairley v. Patterson,* 493 F.2d 598 (5th Cir. 1974); *Cooper v. Allen, supra* ; *Lee v. Southern Home Sites Corp., supra.* In the absence of statutory or contractual authorization, bad faith on the part of the college, or a common benefit situation, the award of attorneys' fees to the successful litigant in this case must be reversed.

That portion of the district court's order concerning reinstatement and backpay is affirmed. The award of attorneys' fees is reversed.

Affirmed in part; reversed in part.

JOHN R. BROWN, Chief Judge (concurring):

I concur fully in Judge Gewin's fine opinion and in the result. I write only to record with a sense of relief and common sense that the Federal Courts are now out of the hair business as Mr. Justice Black long ago said we should be. For high school students the problem is ordinarily not subject to judicial review. And now to *Lansdale* which prescribed a hands off—more accurately, a clippers-razor off—policy for college students we have added their teachers and college administrators.

The only thing left is such a claim from kindergarten through the primary grades. But I apprehend little from this quarter since by now the public, with growing thousands of entirely responsible adult members of the community wearing all sorts of hair and face trims,

has come to its senses and does not see in such variations the seeds of violence and revolution.

Now we can return to the vital matters which overwhelm the Federal Judiciary.