Charles HENRY

v.

TEXAS TECH UNIVERSITY, Dr. Judson F. Williams, Robert L. Pfluger, J. Fred Bucy, Bill Collins, Clint Formby, Dr. John J. Hinchey, A. J. Kemp, Jr., Charles G. Scruggs, Don R. Workman, Cecil Mackey, Grover Murray, Glenn Barnett, George Tyner, Dr. Richard Lockwood, Texas Tech University School of Medicine at Lubbock.

Civ. A. No. CA–5–77–56.

United States District Court,
N. D. Texas,
Lubbock Division.

Jan. 25, 1979.

Don Graf, McCleskey, Harriger, Brazill & Graf, Lubbock, Tex., for plaintiff.

James H. Milam, Crenshaw, Dupree & Milam, Marilyn Phelan, Resident Legal Counsel, Lubbock, Tex., for defendants.

Roland H. Allen, Asst. Atty. Gen., Austin, Tex., for Dr. Judson F. Williams.

## MEMORANDUM ORDER

PATRICK E. HIGGINBOTHAM, District Judge.

A black male employee of Texas Tech Medical School at Lubbock filed this suit under the civil rights acts[1] on behalf of himself and a class of Black and Spanish surnamed American employees and potential employees. The defendants in turn moved to dismiss both the individual and the class claims. After an evidentiary hearing and briefs, the motions to dismiss and the question of class certification demand decision.

### The Proffered Class Representative

Charles Henry is a black male. He holds a Ph.D. degree in the field of education. He was employed by Texas Tech[2] from 1972 until 1976. Henry was employed as a sci-

---

1. 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. § 1981 and § 1983.

2. Two of the issues to be decided are whether the School of Medicine and the University are separate entities, and if so, which employed Dr. Henry. At this point use of the term "Texas Tech" is sufficient.

ence instructor with the Lubbock Independent School District from September, 1956 until 1972. From 1968 to 1972 Henry was employed as a part-time instructor at Texas Tech and received a full-time faculty appointment with the medical school in June, 1972. Dr. Henry held a Master's Degree in 1972 and was working toward his Ph.D. while employed at Texas Tech. In April, 1976, having received a "terminal" contract, Dr. Henry's employment at Texas Tech ended.

Dr. Henry filed a charge of discrimination with the EEOC on April 15, 1976, and received his "right to sue letter" on March 10, 1977. No complaint was filed or referred to any state agency. This suit followed on April 11, 1977. Dr. Henry charges the following unlawful employment practices:

1. Maintaining, recruiting, and hiring policies and practices which discriminate against Blacks and Spanish surnamed Americans based on their race and national origin, respectively.

2. Maintaining policies and practices with respect to employment contracts, assignment of duties, compensation, and working conditions which discriminate against Blacks and Spanish surnamed Americans based on their race and national origin, respectively.

3. Failing to promote Black and Spanish surnamed American employees because of their race and national origin.

4. Maintaining job classifications and placement on the basis of race and national origin.

5. Maintaining hiring policies and practices and promotion policies and practices which set higher requirements for Blacks and Spanish surnamed Americans than for Anglo-Caucasian employees.

6. Maintaining policies and practices with respect to employee privileges which discriminate against Blacks and Spanish surnamed Americans.

7. Maintaining policies and practices which make it more difficult for Blacks and Spanish surnamed employees to advance within their professions than Anglo-Caucasian employees.

8. Failing to compensate Blacks and Spanish surnamed American employees on the same basis as Anglo-Caucasian employees.

9. Maintaining terms and conditions of employment which discriminate or have a discriminatory effect on Blacks and Spanish surnamed Americans because of their race and national origin.

The defendants include Texas Tech University, Texas Tech University School of Medicine at Lubbock, and the members of the Board of Regents, in their official capacity as regents. The two schools have a common board including Dr. Cecil Mackey who serves as President (Chief Executive Officer) of both schools. Dr. Grover Murray, a former president, and certain other officers are also named as defendants in their official capacity.

Dr. Henry seeks to assert claims both individually and as a class representative under section 16 of the Civil Rights Act of 1870, 42 U.S.C. § 1981 (1976), section 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983 (1976), and under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* The defendants have moved to dismiss the action on several grounds, and have challenged the maintenance of the suit as a class action. Before reaching the class questions, the motions to dismiss must be examined.

## Motions to Dismiss

### A. "Instrumentality of State" Challenge to the 1981 and 1983 Claims.

The gravamen of the motions to dismiss those portions of this suit grounded on §§ 1981 and 1983 is that the defendants may not be sued under these provisions by virtue of their relationship to the State of Texas. Defendants argue that this court lacks subject matter jurisdiction to entertain claims under §§ 1983 and 1981 because defendants are not persons for purposes of those statutes and for the reason that the Eleventh Amendment to the United States

Constitution prohibits an action for damages against the state.[3] Defendants rely upon *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) and *Kirker v. More*, 308 F.Supp. 615, *aff'd*, 436 F.2d 423, *cert. denied*, 404 U.S. 824, 92 S.Ct. 49, 30 L.Ed.2d 51 (1970) for their eleventh amendment argument. Their premise is that these defendants are instruments of the state. If Texas Tech is essentially a unit of local government, it is a "person" for purposes of 42 U.S.C. § 1983. *Monell v. Dep. Soc. Ser. City of N.Y.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The court in *Monell*, however, took pains to make clear that its holding did not affect the immunity of states provided by the eleventh amendment:

> Our holding today is, of course, limited to local government units which are not considered part of the State for Eleventh Amendment purposes. 436 U.S. at 690, n. 54, 98 S.Ct. at 2036.

Thus if Texas Tech is the "alter ego" of the state, suit under §§ 1983 and 1981 against it is barred by the eleventh amendment.

■ Before examining that question in greater detail, it is important to note that the eleventh amendment operates as an absolute jurisdictional bar to suits against the state absent consent by the state. This circuit has firmly rejected the notion that the fourteenth amendment operates as a *pro tanto* repeal of the eleventh. *See Jagnandan v. Giles*, 538 F.2d 1166 (5th Cir. 1976).

■ The question, then, is whether Texas Tech is so related to the State of Texas that suit against it is barred by the eleventh amendment. The standards upon which that determination must be made have been set forth by the courts. As put by one commentator:

> Whether a particular government unit is an alter ego of the state is an issue of federal law, and is to be determined through examination of a number of factors; including the degree of state control over the units, the manner in which it is founded, and whether it is separately incorporated. *See, e. g., Soni v. Board of Trustees*, 513 F.2d 347, 351–58 (6th Cir. 1975) (dictum) . . . *Urbano v. Board of Managers*, 415 F.2d 247, 250–52 (3d Cir. 1969); *S. J. Groves & Sons Co. v. New Jersey Turnpike Authority*, 268 F.Supp. 568, 571–79 (D.N.J.1967). *Damage Remedies Against Municipalities for Constitutional Violations*, 89 Harv.L.Rev. 922, 931 n. 57.

The Fifth Circuit in *Hander v. San Jacinto Junior College*, 519 F.2d 273 (5th Cir. 1975)[4] gave some guidance for determining whether the State is the real party in interest for purposes of the eleventh amendment:

> In Eleventh Amendment cases the question of whether the state is "the real party in interest" is one of federal law, but federal courts must examine the powers, characteristics and relationships created by state law in order to determine whether the suit is in reality against the state itself. *Id.* at 279.

In addition to these factors, it is important to consider whether, in the event of mone-

---

**3.** The eleventh amendment, of course, is not literally applicable to a suit against a state by its own citizen, but it has been held to reach such cases. *Hans v. Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890); *Employees of Dept. of Public Health and Welfare v. Dept. of Public Health and Welfare*, 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973).

**4.** *See also Goss v. San Jacinto Junior College*, 588 F.2d 96, p. 98 (5th Cir. 1979).

"Appellants argue that even if the district court had jurisdiction, the Eleventh Amendment bars the award of damages against San Jacinto Junior College under *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662

(1972). *Edelman* held that while states and state officials are protected by the Eleventh Amendment, mere 'political subdivisions' of the state do not enjoy Eleventh Amendment immunity. 415 U.S. at 667 n. 12, 94 S.Ct. 1347. *Accord, Moor v. County of Alameda*, 411 U.S. 693, 717–721, 93 S.Ct. 1785, 36 L.Ed.2d 596 (1973). The issue here is whether San Jacinto Junior College is to be treated as an arm of the state or a 'political subdivision.' The nature of the entity under state law guides our decision. *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. [274] at 280, 97 S.Ct. 568, 50 L.Ed.2d 471."

tary recovery, the judgment would have to be paid from state funds. *Edelman v. Jordan, supra. See also Miller-Davis Co. v. Illinois State Toll Highway Authority*, 567 F.2d 323 (7th Cir. 1977).

The Texas legislature created Texas Tech in 1923 and named it Texas Technological College. In 1969 the legislature changed the name to Texas Tech University. The statutes authorizing the operation of the University and providing for its governance are codified at Tex.Education Code Ann. §§ 109.01 *et seq.* (Vernon 1972 & Supp. 1978). The code provides for the "government, control, and direction of the policies of the university" by "a board of nine regents, who shall be appointed by the governor with the advice and consent of the senate." *Id.* at § 109.21. The statutes further provide that one of the board members act as chief executive officer, and that the board has the power of eminent domain. The funds used to purchase the university's land, buildings, and equipment were appropriated from the general revenues of the State of Texas, *see Texas Technological College v. Fry*, 278 S.W.2d 480 (Tex.Civ. App.—Amarillo 1954), and the University continues to operate by means of state funds.

The Education Code also provides in a separate chapter for the establishment and operation of the Texas Tech University School of Medicine at Lubbock. Tex.Education Code Ann. §§ 110.01 *et seq.* (Vernon 1972 & Supp.1978). The code provides that the medical school is "a separate institution and not a department, school, or branch of Texas Tech University but it is under the direction, management, and control of the Texas Tech University Board of Regents." *Id.* at § 110.01.

In addition, the legislature has established a Coordinating Board, Texas College and University System, Tex.Education Code Ann. §§ 61.001 *et seq.* (Vernon 1972 & Supp.1978), which exercises broad managerial powers over all of the public institutions of higher education in Texas. This board consists of 18 members appointed by the governor with the advice and consent of the Senate. It has power over a broad range of policy issues including curricula, financial appropriations, construction plans, and degree programs.

■ These facts demonstrate that at least in matters of governance and financial policy, the State of Texas exercises broad control over both Texas Tech University and the Texas Tech University School of Medicine. Indeed it is difficult to find any distinction with respect to this issue between the position of Texas Tech here and that of the University of Kansas in *Brennan v. University of Kansas*, 451 F.2d 1287 (10th Cir. 1971), in which the University of Kansas and the University Press of Kansas were held to be alter egos of the State of Kansas and hence immune from suit in federal court by virtue of the eleventh amendment. Moreover, this case is easily distinguishable from *Hander v. San Jacinto Junior College, supra*, which involved an essentially local institution dependent in significant part upon local and not state funds. Additionally, the Texas Supreme Court has found Texas Tech University to be a state agency. *Lowe v. Texas Tech University*, 540 S.W.2d 297 (Tex.1976). Both Texas Tech University and the medical school, then, are alter egos of the state and this court lacks jurisdiction to entertain suit against them under 42 U.S.C. § 1983 or 42 U.S.C. § 1981. A contrary holding would work an unwarranted dilution of the force of the eleventh amendment.

■ The §§ 1981 and 1983 claims against the individual defendants must also be dismissed. These defendants are sued only in their official capacities,[5] and so the suit is equivalent to one against the state, *see Prebble v. Brodrick*, 535 F.2d 605 (10th Cir. 1976), and hence barred by the eleventh amendment and the doctrine of *Hans v. Louisiana, supra.*

---

5. While there is some confusion as to whether Dr. Henry intended to sue the individual defendants as individuals, the pleadings and the testimony from the hearing indicate that they have been sued only in their individual capacities.

B. *The Motion to Dismiss the Title VII Claim.*

1. *Deferral*

■ Dr. Henry's claim under Title VII of the Civil Rights Act of 1964 is not barred by the eleventh amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). The defendants' attack on the Title VII claim is therefore of a different hue. Defendants contend that Dr. Henry's Title VII claim is barred because he failed to exhaust his state remedies before filing a charge with the EEOC as required by 42 U.S.C. § 2000e–5(c). That section provides in pertinent part as follows:

> In the case of an alleged unlawful employment practice occurring in a State . . . which has a . . . law prohibiting the unlawful employment practice alleged and establishing or authorizing a State or local authority to grant or seek relief from such practice or to institute criminal proceedings . . . no charge may be filed [with the EEOC] by the person aggrieved before the expiration of sixty days after proceedings have been commenced under the State or local law . . .

The Fifth Circuit has held in *White v. Dallas Independent School District*, 581 F.2d 556 (5th Cir. 1978), en banc, that Tex. Civ.Stat.Ann. art. 6252–16 (Vernon 1972 & Supp.1978)[6], which prohibits certain acts of discrimination by state officers or employees, including the refusal to employ or the discharge of a person from employment because of the person's race, color, religion, sex, or national origin triggers the deferral requirement of 42 U.S.C. § 2000e–5(c). The Texas statute permits civil actions for injunctive relief to redress violations of the act and provides for criminal sanctions against those who knowingly violate it. The circuit, however, expressly declined to decide whether deferral is a jurisdictional requirement. *White, supra* at 562. Additionally, the circuit reaffirmed the holding in *Nueces County Hospital District v. E.E. O.C.*, 518 F.2d 895 (5th Cir. 1975), that "[t]he heart of the deferral requirement is that the state must prohibit the act of discrimination complained of." *White, supra* at 560.

The effect of the latter holding is clear; Dr. Henry must defer to the state authorities only on his challenge to Texas Tech's hiring and firing policies.[7] Unfortunately, what course to follow now that Dr. Henry and the EEOC have failed to present his charge of racially discriminatory hiring and firing policies to the Texas authorities before the period of limitations elapsed is not equally clear.

In *White*, the Fifth Circuit held that although the plaintiff, Ms. White, failed to satisfy the deferral requirement, she had been "substantially misled by the EEOC's mistake of law," and had not engaged in dilatory tactics. Consequently her suit was not barred by failure to meet the deferral requirement. Ms. White was a former school teacher alleging that she had been unlawfully dismissed because of pregnancy. She had received two letters from the EEOC stating that "timeliness and all other

---

6. "Article 6252–16 Discrimination against persons because of race, religion, color, sex or national origin

"Section 1. (a) No officer or employee of the state or of a political subdivision of the state, when acting or purporting to act in his official capacity, may:

"(1) refuse to employ a person because of the person's race, religion, color, sex, or national origin;

"(2) discharge a person from employment because of the person's race, religion, color, sex, or national origin;"

7. There is some argument that Section 1.(a)(7) of Art. 6252–16 prohibits discrimination in employment policies such as promotion and job classification. That section states:

"(7) [no state employee may] refuse to grant a benefit to, or impose an unreasonable burden upon, a person because of the person's race, religion, color, sex, or national origin;"

The argument is that the reference "benefit" or "burden" is broad enough to cover the acts complained of here. If this were true, those terms certainly would have covered the plaintiff's complaint of "retaliation" in *Nueces County*, and *White* reiterated that deferral is not required on such a charge. *White, supra* at 563.

requirements have been met," whereupon she filed suit in district court without seeking relief under state law. The *White* holding rested on equitable principles, largely unarticulated and, perhaps, unarticulable. Read broadly, the decision could be construed as virtually eliminating the deferral requirement of Title VII except where the plaintiff had engaged in obvious dilatory tactics. On the other hand, the decision could be read as excusing failure to exhaust state remedies only where a charging party was clearly misled by an affirmative misstatement by the EEOC.

There are some similarities between *White* and this case. There was, as in *White*, some question at the time Dr. Henry's complaint was filed whether the Texas statute triggered the deferral requirement of 42 U.S.C. § 2000e–5(c). *Nueces County, supra.* Moreover, both Ms. White and Dr. Henry received "right to sue letters" from the EEOC which did not mention the need to defer to state enforcement agencies. Here, too, the period of limitations has run on the state law remedy, so a finding that the Title VII claim is barred for failure to exhaust would permanently bar the claim. Finally, in neither case is there any indication of dilatory tactics on the part of the plaintiff.

There are also important distinctions in the two cases. Texas Tech discharged Dr. Henry on April 1, 1976. A Fifth Circuit panel held January 26, 1978, in *White v. Dallas Independent School District,* 566 F.2d 906 (5th Cir. 1978), that deferral was a jurisdictional requirement. This was the law in this circuit until the panel order granting an en banc hearing on March 9, 1978. Dr. Henry had from the date of the panel decision until April 1, 1978, when the applicable two-year period of limitations expired, to file his claim with the Texas authorities. More pointedly, the panel decision was a plain warning. During this time, and indeed from before he filed his charge with the EEOC, he was represented by counsel [8] who claim to be more than (and in this court's opinion are) adequate to represent a class of plaintiffs in a Rule 23(b) discrimination class action. This raises the question of to what extent and for how long Dr. Henry actually relied on the EEOC's failure to follow its own regulations. The defendant in *White* argued that by statute responsibility for deferral is placed on the charging party and not the EEOC. The en banc court simply found that the EEOC misled Ms. White and that she should not be penalized. In so holding, the court relied on *Zambuto v. American Telephone & Telegraph Co.,* 544 F.2d 1333 (5th Cir. 1977), where the court held the EEOC's "two-tier letter" approach violative of the employer's statutory rights, but gave the holding prospective effect only. In *Zambuto,* the EEOC's damage was done when 90 days expired, and it was too late after that even if the charging party discovered the EEOC's mistake. Thus reliance on the EEOC for the relatively short period of 90 days was fatal. Here Dr. Henry had 15 months after receipt of the right to sue letter to discover the EEOC's mistake, and he arguably should have been warned of the possible effect of failure to defer by *Nueces County, supra.* The *White* opinion does not reveal if the state period of limitations had expired before the EEOC issued Ms. White a right to sue letter. Nor is it clear in *White* whether the circuit refused to place any responsibility for deferral on the charging party, or simply held that that responsibility was met by Ms. White's continued reliance on the EEOC assurance that "timeliness and *all other requirements*" had been met. Assuming Dr. Henry is entitled to rely on the EEOC even when represented by counsel, that protection was lost when the circuit held the EEOC's policies to be incorrect. After the panel decision in *White,* a litigant is chargeable with a duty to at least inquire if the EEOC gave proper notice to the Texas authorities, even if not required to give notice himself. One is reminded of the concerns expressed by

---

8. It is not apparent if Ms. White was represented by counsel during the administrative proceedings before the EEOC.

Judge Hill in his dissent to the *White* opinion.

Furthermore, Ms. White's letter was affirmatively misleading in that the EEOC told her "all requirements have been met." Dr. Henry's letter made no such statement, but simply said that he had a right to sue because more than 180 days had elapsed since he filed his charges with the EEOC and it had not acted. It is difficult to find an affirmative misstatement of the law in those words to avoid dismissal for failure to defer.

█ It is not denied that Dr. Henry failed to timely inform the district attorney in Lubbock of his charges. The EEOC did not recognize the district attorney as an "official 706 agency," so it did not defer to the Texas authorities but merely sent them a courtesy notice of Dr. Henry's charges. Consequently, this court finds that Dr. Henry's Title VII charges involving discharge and refusal to hire are barred. These complaints against Texas Tech University and medical school are DISMISSED.

### 2. *The Schools are Separate Defendants.*

The other grounds upon which defendants have moved to dismiss the Title VII claim involve the relationship between Texas Tech University and Texas Tech School of Medicine. The two schools contend that they are separate entities and separate employers for purposes of Title VII. Dr. Henry contends that they are a single employer, or at least are estopped from denying it. In his original complaint, and in his charge filed with the EEOC, Dr. Henry named only the university and not the medical school as a defendant. Both institutions are named as defendants in the amended complaint.

The university argues that the suit against it should be dismissed because Dr. Henry was an employee of the medical school and not the university. The medical school seeks dismissal as to it because it was not named in the charge filed with the EEOC. Dr. Henry answers the university's motion by contending that if he was not an employee of the university, he was certainly an applicant for employment after his discharge from the medical school. As earlier stated, however, Dr. Henry's Title VII complaint that the university failed to hire him is barred by his failure to defer. This holding makes unnecessary a ruling on whether the university's failure to hire Henry was fairly raised by him in his charge to the EEOC under *Sanchez v. Standard Brands*, 431 F.2d 455 (5th Cir. 1970). The effect of this failure to defer is closely tied to the question whether Dr. Henry can represent a class composed of employees or applicants for employment with the university. That question will be considered in connection with the discussion of class issues.

The claim of the medical school, however, must be discussed before the class issues are reached. If the university and the medical school are the same employer, of course, the medical school's argument need not be reached, for the naming of the university in the charge would constitute naming of the medical school. For the reasons that follow, however, this court concludes that the institutions were separate and distinct employers.

To begin with, it is clear that the Texas legislature intended that the two institutions be treated as separate entities. When it created the medical school, the legislature decreed that it "is a separate institution and not a department, school, or branch of Texas Tech University . . . ." Tex.Education Code Ann. § 110.01 (Vernon 1972 & Supp.1978). There is nothing in 42 U.S.C. § 2000e(b), the Title VII definition of employer, which implies that the Congress intended that the courts treat two legally distinct employers as a single employer. Dr. Henry argues that the two schools acted toward him as a single employer and with a common employment policy. A review of the evidence, however, leads the court to conclude that the two schools did not act as a single employer toward Dr. Henry, nor did they hold themselves out to be a single employer.

Dr. Henry argues that many of the administrative and executive functions at the two schools are handled by the same people,

such as Mr. Klocko, the director of personnel relations for both schools, Dr. Cecil Mackey, the president of both schools, and the board of regents. Dr. Henry also contends that his reappointment forms were titled "Texas Tech University," not "The School of Medicine," and that his paycheck came from Texas Tech University, not the medical school. For these reasons, Dr. Henry argues, the charge was filed against Texas Tech University.

■ Mr. Klocko testified at the class certification hearing. He is the director of personnel relations for both schools; however, in his role he has dual functions, with two payroll accounts, and he responds to EEOC charges separately for both the university and the medical school. Additionally, each school has its own director of personnel. Mr. Klocko represented the medical school during the EEOC's investigation of Dr. Henry's charge. He sent statistics from the medical school only and talked to medical school officers only in the conciliation efforts. Dr. Cecil Mackey testified that he was president of both schools, and that both he and the board of regents act in separate capacities when dealing with the medical school in accord with the Texas Education Code. Dr. Mackey testified that the two schools have different budgetary functions, different personnel needs and practices, and different affirmative action programs. He testified that the two schools share only a few budget items, such as security, but that there is an allocation to each budget for these costs. His salary alone is not allocated between the two budgets, and all other common employees' salaries are allocated between the two budgets. He testified that the medical school personnel problems are more similar to those of other medical schools than to those of Texas Tech University. Plaintiff's exhibit number 24, the faculty handbook for the year 1976–1977, on page 7 states that Texas Tech University consists of many disciplines, but that the Texas Tech University School of Medicine at Lubbock is a separate educational institution, and that the university plus the medical school along with the museum compose the Texas Tech University complex.

Finally, the plaintiff testified that his duties were connected with the medical school and that he dealt primarily with medical school officials. The sum of this evidence is that the two schools do not act as a single employer with a common policy, and their actions were not such as to mislead Dr. Henry to believe the contrary.

In light of this finding that the university and the medical school were separate employers, it is necessary to consider the medical school's contention that the complaint against it should be dismissed because the medical school was not named in the charge filed with the EEOC. There is a division of authority as to whether the naming of a defendant in a charge filed with the EEOC is a jurisdictional prerequisite to maintenance of a Title VII suit against that defendant. Those courts that have held that it is a jurisdictional requirement have emphasized the importance of the EEOC charge as a means of encouraging voluntary employer compliance through EEOC investigation and conciliation. *See, e. g., Le Beau v. Libbey-Owens Ford Co.,* 484 F.2d 798 (7th Cir. 1973). The courts that have held to the contrary have been persuaded by the idea that broad construction of the EEOC charge to include unnamed parties whose interests have as a practical matter been protected by named parties effectuates the purposes of the act. *See, e. g., Evans v. Sheraton Park Hotel,* 164 U.S.App. D.C. 86, 503 F.2d 177 (1974); *Taylor v. Armco Steel Corp.,* 373 F.Supp. 885 (S.D. Tex.1973); *Byron v. University of Florida,* 403 F.Supp. 49 (N.D.Fla.1975). None of the cases, of course, has permitted suit against a party not named in the EEOC charge where that party's interests were not adequately represented by a party actually named in the charge. The Fifth Circuit has not decided this question, and, in fact, expressly left the question unanswered in *Guerra v. Manchester Terminal Corp.,* 498 F.2d 641, 647 n.6 (5th Cir. 1974).

■ Application of a strict jurisdictional requirement here would work an unduly harsh result where the medical school was

the unnamed party, yet was given notice and in fact represented itself. To hold in the light of its actual participation in the conciliation process that Dr. Henry's Title VII claim may not be asserted against the medical school because it was not named in his EEOC charge would be to sacrifice common sense for procedural nicety. This court refuses to follow that course, and holds that the Texas Tech School of Medicine is a proper defendant with respect to the Title VII claim.

## The Class Question

Dr. Henry asks the court to certify a class of:

All minority persons qualified to hold a faculty, administrative, managerial, or executive level position with a University, who have applied to Texas Tech University and Texas Tech University School of Medicine since January 1, 1970, all minority persons who have been employed in such positions by Texas Tech University and Texas Tech University School of Medicine during the period from January 1, 1970 to present, all qualified minority persons who would have made application to Texas Tech University and Texas Tech University School of Medicine for said positions since January 1, 1970, and all qualified minority persons who will make application for said positions with the Texas Tech University and Texas Tech University School of Medicine in the future.

Defendants deny that any class exists but urge alternatively that it should be limited in scope as to both membership and claims. Both sides cite many cases—few of which are here helpful. Class certification calls upon the equity power of the court to tailor and shape a proper class. Suits to redress claimed racial bias are said to present inherent class issues; in a sense they do. It does not follow that each such suit is exempt from the overlapping and other multi-lensed focus of Rule 23(a), *cf. Aiken v. Neiman-Marcus,* 77 F.R.D. 704 (N.D.Tex. 1977).

Before the court can certify a class, the requirements of Fed.R.Civ.P. 23(a) and 23(b) must be met. Rule 23(a) provides: (a) Prerequisites to a class action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. Rule 23(b)(2) provides that in addition to satisfying Rule 23(a), an action may be maintained as a class action if the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

Defendants attack the proposed certification in the following four ways:

1. No potential applicants ought to be included;

2. No applicants ought to be considered because Henry as an employee did not suffer the same injury as the class he would represent;

3. The class ought not include persons with Spanish surnames because Henry is a black; and

4. No applicants for employment with Texas Tech University or its employees ought to be included because the University and the Medical School are separate entities and Dr. Henry neither applied for employment nor was employed by the University.

Defendants' attacks must be first considered because the resolution of them can have a radical effect upon the Rule 23(a) requirements. In doing so, one must remember that Dr. Henry's Title VII claims of discriminatory discharge and failure to hire are barred against both the medical school and the university.

### A. Applicants.

Henry wishes to represent those who applied but were not hired. Defendants ar-

gue that although decisions of this and other circuits had before May, 1977 allowed an employee to represent a class whose membership included unsuccessful applicants, the Supreme Court in *East Texas Motor Freight System, Inc. v. Rodriguez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) cut the legal legs from under those cases. *Rodriguez* has been read by commentators as a retrenchment in Title VII class action support largely because the court there explicitly required that a class representative and his class possess the same interest and suffer the same injury. The decision is susceptible to that construction but its sameness of interest and injury standard is scarcely an explicit one.

*Rodriguez* involved a Title VII attack by three city truck drivers, all Mexican-Americans, against their employer's policy of non-transfer between city-driver (local) and line-driver (long haul) jobs. The claim was that the no-transfer policy along with the practice of denying transfer of seniority rights upon an employee's move from a city to a line-driver position amounted to unlawful racial and ethnic discrimination. The plaintiffs alleged that the case was a class action on behalf of all blacks and Mexican-Americans who had been denied equal employment opportunities by the defendants because of race and national origin, including applicants who had been denied employment; but the plaintiffs failed to move for class certification, and the trial court made no certification. The district court dismissed the class allegations on the basis of plaintiffs' failure to move for class certification and their stipulation that the only issue before the court was the employer's rejection of their applications for line-driver positions. The court denied the individual claims for relief, finding that the plaintiffs were unqualified to become line drivers, and that the no-transfer and seniority policies were proper business practices applied without discriminatory purpose.

On appeal, the Fifth Circuit reversed the trial court's decision, 505 F.2d 40 (5th Cir. 1974), certifying a class consisting of the company's black and Mexican-American city drivers covered by the collective bargaining agreements for the State of Texas, and finding unlawful the company's no-transfer and seniority policies.

The Supreme Court then reversed the decision of the Court of Appeals, focusing largely upon the question of adequacy of class representation. The Court held that the Fifth Circuit had erred in certifying a class because the named plaintiffs could not adequately represent the purported class. The Court emphasized that the plaintiffs were not members of the class they purported to represent, because the trial court had found them unqualified to become line drivers. Hence they suffered no injury from the alleged discriminatory practice and so were "simply not eligible to represent a class of persons who did allegedly suffer injury." *Id.* at 404, 97 S.Ct. at 1897. Moreover, the Court noted, the plaintiffs' failure to move for class certification and the recent rejection by employees of a proposal to merge city- and line-driver collective bargaining units further suggested inadequacy of representation. The Court concluded, then, that the district court "did not err in denying individual relief or in dismissing the class allegations . . . ." *Id.* at 406, 97 S.Ct. at 1898.

The analytical fulcrum of the *Rodriguez* decision is Rule 23's requirement of fair and adequate representation of the class by the class representative. It is in that context that the Court's language that "a class representative must be part of the class and 'possess the same interest and suffer the same injury as the class members (citations omitted)' " must be read. In addition, it is significant to note that *Rodriguez* involved post-trial review of the question of adequacy of representation and that the resolution of the question will almost invariably be less clear before trial.

This court has found the *Rodriguez* requirement of sameness of interest and injury to be met by representation of " . . . class members suffering from different practices [from the representative], but the product of the same animus, certainly where there is a nexus among the prac-

tices," *Vuyanich v. Republic National Bank of Dallas,* 78 F.R.D. 352 (N.D.Tex.1978). There is no dissonance between *Vuyanich* and *Rodriguez* unless, as some believe, *Rodriguez* sounded a death knell for across-the-board suits. This circuit before *Rodriguez* had specifically approved of across-the-board approaches. *See, e. g., Long v. Sapp,* 502 F.2d 34, 43 (5th Cir. 1974) where the court stated:

> The "across the board" approach has proved an effective means of implementing the congressional purpose embodied in the civil rights acts. . . . *Id.* at 43.

In addition, this circuit had before *Rodriguez* expressly allowed an applicant to complain of policies affecting employees. *Carr v. Conoco Plastics, Inc.,* 423 F.2d 57 (5th Cir. 1970). Moreover, representatives of one skill have been allowed to represent employees of other skills. *Swint v. Pullman-Standard,* 539 F.2d 77 (5th Cir. 1977); *Baxter v. Savannah Sugar Refining Corp.,* 495 F.2d 437 (5th Cir. 1974).

In *Payne v. Travenol Laboratories, Inc.,* 565 F.2d 895 (5th Cir. 1978), which was decided one year after the Supreme Court's decision in *Rodriguez,* the Fifth Circuit left unclear its interpretation of *Rodriguez's* reaffirmation of the same interest and injury test. In reviewing a trial court injunction, *Payne* held that when suit was filed if the class representatives each met an employer requirement of a tenth grade education, both the representative and the class lacked standing to attack the rule. The court in *Payne* quoted language from its 1976 decision of *Thurston v. Dekle,* 531 F.2d 1264 (5th Cir. 1976) that:

> The fact that some members of the class may have standing to raise this claim is irrelevant . . . [T]he necessary requirement is for a *named* plaintiff to have standing at the time the litigation is filed. . . . (emphasis in original) *Id.* at 1269–70.

The court, however, did permit the named plaintiffs to represent the class of persons injured by the college degree requirement, even though the court assumed that "the named plaintiffs were not strictly affected by the college education requirement." *Id.* at 900. Nonetheless, there is no necessary conflict between the standing requirement of *Payne* and the same interest and injury test of *Rodriguez* on the one hand and the Fifth Circuit recognition in *Payne* that

> . . . Even assuming that the named plaintiffs were not strictly affected by the college education requirement, this Court's policy regarding class actions in employment discrimination cases dictates that plaintiffs could properly challenge Travenol's college degree requirement. Plaintiffs' action is an "across the board" attack on unequal employment practices . . . pursuant to a policy of discrimination. As parties who have allegedly been aggrieved by some of those discriminatory practices, plaintiffs have demonstrated a sufficient nexus to enable than to represent other class members suffering from different practices motivated by the same policy. *Id.*

The question is what is a sufficient nexus among the plaintiff, the employer's practice, and the class member. It is not clear why the nexus is absent if the tenth grade education requirement was a product of the same racist animus that injured the class representatives by a requirement that they have college degrees. In requiring that a class representative have been injured by the requirement of a tenth grade education, *Payne* focused not on the animus but on the practice; in reviewing claimed exclusion from analyst positions, however, the *Payne* court shifted its focus to the animus of the employer, not the practice. "Strictly speaking" plaintiffs were not injured by any illegal exclusion from analyst positions; just as strictly speaking they were not injured by the requirement of a tenth grade education which they had. In sum, the Fifth Circuit explicitation of *Rodriguez* is not clear.

■ Does *Payne* bar Dr. Henry's representation of applicants since Dr. Henry was not injured by any illegal hiring practice (of the medical school), or may he do so with allegations which show that hiring and pro-

motion are the product of the same animus? Pending further guidance by other courts, this court will adhere to its view that *Rodriguez* did not overturn this circuit's view that an applicant denied employment is not necessarily foreclosed from representing employees hurt by practices flowing from the same animus, at least in across the board attacks. *See also Aiken v. Neiman-Marcus, supra.*

■ However, the effect of *White v. DISD* combined with *Rodriguez* is that Dr. Henry cannot represent applicants and discharged employees under Title VII. The plaintiffs in *Rodriguez* were not eligible to represent a class of line-drivers because they were unqualified to become line-drivers. Dr. Henry is not eligible to represent a class of applicants or discharged parties because he is barred from asserting those claims for failure to defer to the state authorities. The consequence of *White* is that his interest is not assertable under Title VII, and he cannot sue for any injury he suffered from a violation of Title VII. To dismiss his individual claims yet allow him to assert those claims as class representative would eviscerate the deferral requirement of *White*. He simply has no standing to assert claims of discriminatory hiring and firing and therefore cannot lead a class attack on those policies.

B.  *Blacks and Spanish Surnamed Americans.*

■ Whether the court focuses on the animus or the practice, it is clear that Dr. Henry failed to demonstrate a nexus between his claims and those of the class of Spanish surnamed American applicants and employees. Before certification, a plaintiff in a class action must demonstrate some proof of across the board discrimination. Whatever be that standard of proof, *Aiken v. Neiman-Marcus, supra,* Dr. Henry has not met that burden in his attempt to represent Spanish surnamed Americans. He has shown no proof of any specific practice which affects Spanish surnamed Americans, much less one which affects both Spanish surnamed Americans and him. Nor has he

shown any proof of an animus on the part of the defendants which is directed toward both Spanish surnamed Americans and blacks. It is by no means conceptually impossible under *Rodriguez* for a black to represent a Spanish surnamed American, but even so, Dr. Henry has failed to prove a sufficient nexus between his claims and the possible claims of a class of Spanish surnamed Americans. Furthermore, he failed to mention discrimination against Spanish surnamed Americans in his EEOC charge. No investigation of discrimination against Spanish surnamed Americans could reasonably be expected to grow out of his charge which was specifically directed to race discrimination against blacks. *Cf. Sanchez v. Standard Brands, supra.*

C.  *Employees of Texas Tech University.*

■ This court has found that the medical school and Texas Tech University are separate defendants with distinct employment policies. Several of the factors which persuaded the court are that each has a separate director of personnel, a separate affirmative action program, and a separate budget. This is understandable when one considers the personnel needs of a university as opposed to those of a medical school which is closely tied to its working hospital. Certification of a single class against both schools is impossible because the plaintiff would be litigating against distinct employment policies and practices. Two separate classes or subclasses would be necessary. The effect would be two lawsuits, and a separate suit against the university is unacceptable because Dr. Henry was never an employee of the university and is not familiar with its employment and promotion practices. His only relation to a class of employees is that he claims to have been rejected for employment because of an alleged discriminatory animus, and he is barred from asserting even that tenuous link. At best Dr. Henry would have difficulty representing a group he was never part of and with whose problems he is not familiar. At worst his interests are inimical to those of present employees. Because

he cannot represent Title VII claims of applicants and discharged employees and he has no personal knowledge of university employment practices, the court finds Dr. Henry is inadequate to represent any class of persons with Title VII claims against Texas Tech University.

### D. *Employees of the Medical School.*

 With his Title VII claims of discriminatory hiring and discharge policies barred by *White v. DISD,* Dr. Henry has remaining his individual and class claims against the medical school concerning its policies affecting past and present employees. The parties were asked to estimate the number of potential members of the class if the class were limited to all blacks who had been employed in faculty, administrative, managerial, or executive level positions with the school of medicine since January 1, 1970 to the present. The plaintiff estimated that the number would be fewer than 20. Defendants felt this was too high based on the 1978 EEO–6 report showing two blacks so qualified, and a 1976 EEO report showing four blacks. Not only is the number of potential class members very small, but they are also easily identified. Joinder would be a simple matter. None so far have come forward to join in Dr. Henry's suit or to testify in his behalf. When questioned, Dr. Henry was able to name only one or two possible other cases of discrimination. With this evidence, the court finds that a class of all black employees in faculty, administrative, managerial, or executive level positions with the school of medicine fails to meet the numerosity requirement of Rule 23(a).

### Conclusion

Dr. Henry's motion to certify a class is DENIED. His §§ 1981 and 1983 claims against Texas Tech Medical School, Texas Tech University, and the individual defendants sued are DISMISSED. His Title VII claims against the Medical School and the University for discriminatory discharge and failure to hire are also DISMISSED. No Title VII claims were asserted against the

individual defendants. His individual Title VII claims of discrimination against him in the terms and conditions of his employment at Texas Tech Medical School may proceed.